**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICAN TRUCKING ASSOCIATIONS, INC.,
            *Plaintiff-Appellant,*

v.

THE CITY OF LOS ANGELES; THE HARBOR DEPARTMENT OF THE CITY OF LOS ANGELES; THE BOARD OF HARBOR COMMISSIONERS OF THE CITY OF LOS ANGELES,
            *Defendants-Appellees,*

NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; COALITION FOR CLEAN AIR, INC.,
  *Defendants-intervenors-Appellees.*

No. 10-56465

D.C. No.
2:08-cv-04920-CAS-CT

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
June 10, 2011—Pasadena, California

Filed September 26, 2011

18193

Before: Betty B. Fletcher and N. Randy Smith,
Circuit Judges, and Rudi M. Brewster,
District Court Judge.*

Opinion by Judge B. Fletcher;
Dissent by Judge N. R. Smith

---

*The Honorable Rudi M. Brewster, Senior District Court Judge for the U.S. District Court for Southern California, San Diego, sitting by designation.

## COUNSEL

Robert Digges, Jr. (argued), Chief Counsel, American Trucking Associations, Inc. Arlington, Virginia; Stephen S. Anderson, Jr., William Stephen Cannon, Seth David Greenstein, Richard Levine, and Evan P. Schultz, Constantine, Cannon LLP, Washington, D.C.; Christopher Chad McNatt, Jr., Scopelitis, Garvin, Light, Hanson & Feary, LLP, Pasadena, California, for the petitioner-appellant.

Steven S. Rosenthal (argued), Susanna Chu, David Cousineau, and Alan Palmer, Kaye Scholer LLP, Washington, D.C.; Joy Murakami Crose and Simon Michael Kann, LA City Attorney's Office, San Pedro, California; Thomas A. Russell and Carmen A. Trutanich, City of Los Angeles, San Pedro, California, for defendants-appellants the City of Los Angeles and the Board of Harbor Commissioners.

Melissa Lin Perrella (argued) and David Richard Pettit, Natural Resources Defense Council, Inc., Santa Monica, California, for defendants-intervenors-appellees The National Resources Defense Council, Sierra Club, and Coalition for Clean Air, Inc.

Anthony T. Caso, Law Office of Anthony T. Caso, Orange, California; John C. Eastman, The Claremont Institute Center for Constitutional Jurisprudence, Orange, California, for amicus-curiae The Center for Constitutional Jurisprudence and Harbor Trucking Association.

Kamala Harris and Susan Lea Durbin, Office of the California Attorney General, Sacramento, California, for amicus curiae the State of California.

John R. Bagileo, Law Office of John R. Bagileo, Glenwood, Maryland; Mark Irving Labaton, Motley Rice LLP, Los Angeles, California, for amicus curiae the Intermodal Association of North America, Inc.

William L. Messenger, National Right to Work Legal Defense Foundation, Springfield, Virginia, for amicus curiae Raymond Porras, Pilar Orellana, and the National Right to Work Legal Defense Foundation.

Paul D. Cullen, Jr., The Cullen Law Firm, PLLC, Washington, D.C., for amicus curiae The Owner-Operator Independent Drivers Association, Inc.

## OPINION

B. FLETCHER, Circuit Judge:

Beginning in 2008, the Port of Los Angeles (POLA, or the Port) prohibited motor carriers from operating drayage trucks[1] on Port property unless the motor carriers entered into "concession agreements" with the Port. The concession agreements set forth fourteen specific requirements covering, among other things, truck driver employment, truck maintenance, parking, and Port security. The agreements were adopted as part of the Port's "Clean Truck Program" (CTP), which includes a progressive ban on older (and higher-polluting) trucks on Port property, a multi-faceted incentive program to support acquisition of clean trucks, and a system of penalties on transport of cargo by older trucks. The Port adopted the CTP in response to community opposition, including litigation, that had successfully stymied Port growth from the mid-1990s through 2007.

---

[1]Drayage trucks move cargo from marine terminals at the Port (where shipping companies unload containers) to customers, railroads, or other trucks for long-distance transport.

American Trucking Associations, Inc. (ATA, a national association of motor carriers),[2] challenges the concession agreements, arguing that they are preempted by the Federal Aviation Administration Authorization Act (FAAA Act), 49 U.S.C. § 14501 et seq. After obtaining a preliminary injunction against several provisions of the concession agreements, ATA challenged five specific provisions at trial. The district court held that none of the challenged provisions fell within the scope of FAAA Act preemption, first because some did not relate to motor carriers' rates, routes, and services, and second because the State adopted the entire agreement (and the challenged provisions in particular) in its capacity as a market participant, rather than a market regulator. *See* 49 U.S.C. § 14501(c)(1). The district court further held that the FAAA Act's exemption for regulation "genuinely responsive to motor vehicle safety" saved from preemption the provision requiring motor carriers to create and administer regular maintenance plans. *See* 49 U.S.C. § 14501(c)(2)(A).

ATA appeals. We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court in large part, but reverse its decision that the employee-driver provision of the concession agreement falls within the market participant doctrine and is not preempted.

## I.

### A.

The Port of Los Angeles is an independent division of the City of Los Angeles, managed by the Board of Harbor Commissioners (BHC or the Board). It "occup[ies] land that was granted by the State of California . . . via the California Tidelands Act, and the Port[ ] hold[s] the land in trust for the benefit of the people of California." *Am. Trucking Ass'ns, Inc. v.*

---

[2]Approximately thirty of the six hundred motor carriers currently operating at the Port are members of ATA.

*City of L.A.*, 559 F.3d 1046, 1048-49 (9th Cir. 2009) (*ATA-II*). The Port is not, however, taxpayer-supported; it depends entirely on property leases and fees for its revenue, and manages its funds independent of the City. The Port develops terminal facilities and then leases those facilities to shipping lines and stevedoring companies.[3] It handles more shipping container and cargo volume than any other port in the country, and competes with other ports for business.

Terminal operators unload cargo from ships docked at the Port into marine terminals. From the marine terminals, drayage trucks transport cargo to customers (or to off-Port long-distance trucks or railroads for further transport). "A supply of drayage trucks and drivers is integral to cargo movement at the Port." Cargo owners, ocean carriers, railroads, and other transportation providers arrange for drayage services through Licensed Motor Carriers (LMCs or motor carriers). Prior to 2008, most LMCs serving the Port did not own or operate drayage trucks; rather LMCs contracted with independent owners and operators of trucks to actually provide the drayage services. The Port does not directly contract for any drayage services.

Around 1997, the Port developed plans to expand its cargo terminal facilities in order to accommodate more (and larger) ships. *See Natural Res. Def. Council, Inc. v. City of L.A.*, 126 Cal. Rptr. 2d. 615, 618 (Cal. Ct. App. 2002). Those plans have been stymied by legal opposition from community and environmental groups, which claimed that the Port's expansion would increase air pollution, that such pollution would adversely effect the health of people in the surrounding communities,[4] and that the Port did not comply with environmental laws in planning its expansion. *Id.* In 2002, a California

---

[3]Stevedores manage the loading and unloading of ships. *Black's Law Dictionary* 1539 (9th ed. 2009).

[4]The Port is located in California's South Coast Air Basin, an EPA non-attainment area for several air quality standards. In 2008, the Basin had the worst air quality in the nation for a number of pollutants. The Port is responsible for a significant portion of these pollutants. In 2008, the population residing in the area around the Port suffered an average cancer risk from air pollution more than 60% higher than the average in the South Coast Air Basin.

appellate court enjoined construction of a new terminal facility for the China Shipping Line Company, concluding that the Port had failed to comply with the requirements of the California Environmental Quality Act. *Id.* at 628. The Port settled that suit in 2003 for more than $80 million. Similarly, in 2007, environmental and community groups threatened to seek an injunction of the Port's plan to expand its TraPac Terminal. The Port entered into a settlement agreement in April 2008, requiring it to establish a five-year community mitigation plan to offset the environmental impact of the proposed expansion.

In response to the opposition to Port expansion, the Boards of Harbor Commissioners for Los Angeles and Long Beach adopted a Clear Air Action Plan (CAAP) in November 2006.[5] In the CAAP, the Port announced its intention to "grow green" and achieve a 45% reduction in total emissions by 2012. The Ports stated that they "recognize that their ability to accommodate the projected growth in trade will depend upon their ability to address adverse environmental impacts . . . that result from such trade."

Recognizing that trucks are a major source of air pollution at the Port, the CAAP introduced the Clean Truck Program, which was "designed to reduce emissions from the heavy duty trucks involved in port drayage to improve the health of people living in the communities surrounding the [Port]." The CAAP directed Port staff to "undertake a 5-year, focused effort to replace or retrofit the entire fleet of over 16,000 trucks that regularly serve our Port . . . ." From November 2006 through February 2008, the Ports worked to develop the

---

[5]The Ports of Los Angeles and Long Beach are contiguous and form a single physical Port, although they are managed independently. Though the Port of Long Beach was originally a party to this lawsuit, the Port of Long Beach and Appellees settled in October 2009, and the district court dismissed the Long Beach defendants with prejudice. The Long Beach claims are not at issue in this case.

Clean Truck program. The Ports held a number of public meetings, consulted with stakeholders, and hired consultants to evaluate ideas for implementation.

In October 2007, the Port adopted the first part of its Clean Truck Program: a progressive ban on older, higher-polluting trucks, with the goal that by 2012 all trucks visiting the Port frequently or semi-frequently will meet the United States Environmental Protection Agency's 2007 emissions standards. The ban forbids terminal operators to allow non-compliant trucks to enter Port property. In December 2007, the Port also implemented a Clean Truck Fee, which functions as a penalty to incentivize rapid replacement of older trucks. The fee is charged to terminal operators, not to motor carriers, and applies to every container transported during the transition period by a drayage truck not in compliance with 2012 emissions goals. Neither the progressive ban nor the Clean Truck Fee are directly at issue in this appeal.

During its design of the Clean Truck Program, the Port identified several dilemmas it believed it needed to address. The Port believed that it would be very difficult for drayage service providers to comply with the progressive ban, particularly in light of research showing that drayage service providers had low capital and limited opportunities to obtain credit to invest in the acquisition of new trucks. Accordingly, the Port recognized that it would need to provide substantial financial grants to support the Clean Truck Program. The Port also wanted to "ensure that the Clean Trucks Program funding system yields more than temporary benefits." The Port was especially concerned with ensuring that trucks purchased or retrofitted using State funding were maintained to ensure environmental compliance and safety. This concern stemmed from the Port's belief that independent owner-operators had little capital to invest in maintaining cleaner trucks and that current mechanisms were inadequate to ensure maintenance on each individual truck.

The Port was also concerned that the Clean Truck Program, in combination with the Transportation Worker Identification Credential (TWIC) program,[6] would result in significant losses of drayage truck drivers and disruption of Port services. After engaging in extensive study of Port drayage, the Port estimated that approximately 16,800 trucks would need to be replaced or retrofitted, and that an additional 6,000 to 13,000 trucks would be necessary to maintain drayage services when the Port expanded. The Port suspected that the Clean Truck Program would be prohibitively expensive for independent owner operators and could result in a significant disruption in drayage services. It also believed that 10 to 20% of extant drayage truck drivers would be unable to comply with TWIC requirements and thus unable to continue with port drayage. Left unaddressed, the Port concluded, these dilemmas could result in a crisis.

To address its concerns, the Port decided to implement concession agreements as part of the Clean Truck Program. It hired consultants to examine whether proposed concession agreements would further the Port's economic, operational, and safety goals. Some of the major issues the consultants considered were: (1) whether to provide incentives only to licensed motor carriers, or to all independent owner operators; (2) whether to require operational criteria to provide oversight of drayage truck operations; (3) and whether to require licensed motor carriers to convert to an "employee-only" model as opposed to using independent owner-operators.

Ultimately, the consultants reached similar conclusions. Each report recognized that stringent operational criteria and

---

[6]The Transportation Worker Identification Credential (TWIC) is a "security measure that will ensure individuals who pose a threat do not gain unescorted access to secure areas of the nation's maritime transportation system" *See* Transportation Security Administration, TWIC Program Information, *available at* http://www.tsa.gov/what_we_do/layers/twic/program_info.shtm.

the adoption of an employee-only model for motor carriers would result in significant economic hardship for drayage truck providers, likely putting many of the more economically-marginalized companies out of business. Yet, each recommended that converting to such a model would have greater long-term benefits and provide the Port with the "best guarantee" of long-term sustainability in port drayage.

In March 2008, the Port approved a multi-faceted incentive program and a concession agreement system. The incentive program was designed to "encourage Licensed Motor Carriers to cooperate" with the progressive ban. These programs included the Truck Funding Program, which offers grants covering 80% of the cost of obtaining a new, compliant truck or 100% of the costs of retrofitting older trucks, and a lease-to-own program with financial institutions selected by the Port and financial assistance towards the purchase of trucks at the end of the lease term; a Scrap Truck Buyback program, which provides a $5,000 bonus incentive for scrapping pre-1989 drayage trucks; a Procurement Assistance Program to help smaller motor carriers obtain better terms on new truck purchases; and a Concession Business Outreach Program. Though other incentives are available to any owner of qualifying trucks, the Truck Funding Program is available only to licensed motor carriers who are "concessionaires" in good standing with the Port, and funding priority is given to "concessionaires with a history of port drayage and financing." The funding is not available to independent owner-operators. In addition, concessionaires receiving funding must "commit to a minimum Port drayage frequency for each new truck of a minimum average of six trips per week for five years." The incentive programs are not directly at issue in this appeal.

Finally, the Board issued an order approving concession agreements and providing that, effective October 1, 2008, "no Terminal Operator shall permit access into any Terminal in the Port of Los Angeles to any Drayage Truck unless such Drayage Truck is registered under a Concession or a Day Pass

from the Port of Los Angeles." The concession plans created a direct contractual agreement between the Port and motor carriers providing drayage services.

Five provisions of the concession agreements are at issue in this appeal:

1. Provision III(d) requires concessionaires to transition over five years to using 100% employee drivers rather than using independent owner-operators. (The employee-driver provision).

2. Provision III(f) requires concessionaires to submit for approval "an off-street parking plan that includes off-street parking locations for all Permitted Trucks" and requires concessionaires to ensure that Permitted Trucks are "in compliance with parking restrictions by local municipalities." (The off-street parking provision).

3. Provision III(g) makes concessionaires "responsible for vehicle condition and safety" and requires them to "ensure that the maintenance of all Permitted Trucks . . . is conducted in accordance with manufacturer's instructions." (The maintenance provision).

4. Provision III(l) requires concessionaires to "post placards on all Permitted Trucks" when the trucks are "entering and leaving Port Property and while on Port Property." The placards shall "refer[ ] members of the public to a phone number to report concerns regarding truck emissions, safety, and compliance to the Concession Administrator and/or authorities." (The placard provision).

5. Provision III(n) requires a concessionaire to "demonstrate[ ] to the satisfaction of the Execu-

tive Director that it possesses the financial capability to perform its obligations under th[e] Concession [agreement]." (The financial capability provision).

Each concessionaire also agreed to pay a one-time concession fee of $2,500, and an annual fee of $100 for each permitted truck. As of April 2010, approximately 600 motor carriers had signed concession agreements with the Port.

## B.

The procedural history of this case is extensive; we commend the reader to the orders and opinions discussing ATA's quest for a preliminary injunction.[7] Suffice it to say that ATA was initially denied a preliminary injunction in full and this court reversed. *See generally Am. Trucking Ass'ns, Inc. v. City of L.A.*, 577 F. Supp. 2d 1110 (C.D. Cal 2008) (*ATA-I*) (holding that the market participant doctrine did not apply but denying preliminary injunction on the grounds that the safety exception applies); *ATA-II*, 559 F.3d 1046 (reversing the safety exception decision and remanding). On remand, the district court granted a preliminary injunction against the employee driver provision, the parking provision, and the financial capability provision, but not the maintenance and placard provisions. *See generally Am. Trucking Ass'ns, Inc. v. City of L.A.*, No. CV 08-4920, 2009 WL 1160212 (C.D. Cal. Apr. 28, 2009) (*ATA-III*). ATA again appealed. We reversed only with respect to the placard provision. *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 596 F.3d 602 (9th Cir. 2010)

---

[7]*See Am. Trucking Ass'ns, Inc. v. City of L.A.*, 577 F. Supp. 2d 1110 (C.D. Cal 2008) (*ATA-I*)(denying preliminary injunction on the grounds that the safety exception applies); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir 2009) (*ATA-II*) (reversing the safety exception decision and remanding); *Am. Trucking Ass'ns, Inc. v. City L.A.*, No. CV 08-4920, 2009 WL 1160212 (C.D. Cal. 2009 Apr. 28, 2009) (*ATA-III*); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 596 F.3d 602 (9th Cir. 2010) (*ATA-IV*).

*(ATA-IV)*. All told, the maintenance and placard provisions have been operative since April 2009, but the employee driver, parking, and financial capability provisions have not. After a bench trial on the merits, the district court made 105 specific findings of fact, and concluded that none of the challenged provisions were preempted. ATA appeals.

## II.

We review a district court's decision regarding federal preemption de novo. *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), *abrograted on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 428 (2002), *and Tillison v. City of San Diego*, 406 F.3d 1126 (9th Cir. 2005); *see also United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc) (If a "'question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, . . . the question should be classified as one of law and reviewed de novo.'") (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1987)).

The district court's factual determinations are reviewed for clear error, and may be reversed only if they are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record," leaving the court of appeals with a "definite and firm conviction" that a mistake has been committed. *Hinkson*, 585 F.3d at 1251, 1263.

## III.

We first discuss the law relevant to this appeal, and address ATA's contentions that the district court misinterpreted the applicable law. We do not, in this section, address ATA's contentions that the district court misapplied the law to the facts. We will apply the law to the facts in section V of this opinion.

**[1]** Congress enacted the FAAA Act in 1994 to prevent States from undermining federal deregulation of interstate trucking. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008); *Tocher*, 219 F.3d at 1048. The FAAA Act provides as a "general rule" that "a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

In determining whether § 14501(c)(1) of the FAAA Act preempts State action, we ask three questions. First, we must consider whether the provision "relate[s] to a price, route, or service of a motor carrier." *Id.*; *see also Rowe*, 552 U.S. at 368. If the answer is no, the provision does not fall within the preemptive scope of § 14501(c)(1). If the answer is yes, we must consider whether the provision "has the force and effect of law"— that is, whether the provision was enacted pursuant to the State's regulation of the market, rather than the State's participation in the market in a proprietary capacity. 49 U.S.C. § 14501(c)(1); *see also Tocher*, 219 F.3d at 1049-50. If the provision does not fall within the market participant doctrine *and* relates to rates, routes, or services, we turn to the third inquiry and consider whether any of the FAAA Act's express exemptions save the regulation from preemption. As relevant here, the FAAA Act does not "restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A); *see also City of Columbus*, 536 U.S. at 428.

ATA argues that the district court misidentified and misapplied the law at every step. We first consider each of ATA's general challenges to the district court's analysis. We reject ATA's arguments that (1) the concession agreements *per se* affect rates, routes, and services; (2) the market participant doctrine does not apply because the Port does not "procure" drayage services; and (3) that the Supreme Court's decision

in *Castle v. Hayes Freight Lines, Inc.*, 348 U.S. 61 (1954) precludes the application of the safety exception to this case.

## A.   Related to Rates, Routes, or Services

"[S]tate enforcement actions having a connection with, or reference to [motor] carrier rates, routes, and services are pre-empted." *Rowe*, 552 U.S. at 370-371 (internal quotation marks and emphasis omitted) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S 374, 384, 386-84, 390 (1992) (interpreting the nearly identical preemption provision of the Airline Deregulation Act of 1978, 49 U.S.C. app. § 1305(a)(1)). The terms "rates, routes, and services" were "used by Congress in the public utility sense; that is, service refers to such things as the frequency and scheduling of trans-portation, and to the selection of markets to or from which transportation is provided. . . . . Rates indicates price; routes refers to courses of travel."[8] *Air Transport Ass'n of Am. v. City & Cnty. of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001) (internal quotation marks, citations, and alterations omitted); *see also Rowe*, 552 U.S. at 372-73 (describing a motor carrier's services as its system for picking up, sorting, and carrying goods).

In determining whether a provision has a connection to rates, routes, or services, we must examine the actual or likely effect of a State's action. *Cf. Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc.*, 519 U.S. 316, 325 (1997); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998). If the State, for example, mandates that motor carriers provide

---

[8]The Airline Deregulation Act preempts any provision that relates to "*rates*, routes and services." 49 U.S.C. app. § 1305(a)(1) (emphasis added). The FAAA Act preempts any provision that relates to "*prices*, routes, and services." 49 U.S.C. § 14501(c)(1). We use the terms "prices" and "rates" interchangeably. *See Rowe*, 552 U.S. at 375 (discussing whether a state provision relates to *rates* and is preempted under the FAAA Act).

a particular service to customers, or forbids them to serve certain potential customers, the effect is clear, and the provision is preempted if it has the force and effect of law. *See Rowe*, 552 U.S. at 372-73; *Morales*, 504 U.S. at 388-89 (noting that advertising guidelines expressly referenced rates and had a forbidden significant effect on the fares charged). The waters are murkier, though, when a State does not directly regulate (or even specifically reference) rates, routes, or services. We recognize that FAAA Act "pre-emption may occur even if a [S]tate law's effect on rates, routes, and services 'is only indirect.' " *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 386). At the same time, we require that the effect on rates, routes or services be more than "tenuous" or "remote." *Id.* at 371 (quoting *Morales*, 504 U.S. at 390).

In such a "borderline" case, the proper inquiry is whether the provision, directly or indirectly, "binds the . . . carrier to a particular price, route or service and thereby interferes with competitive market forces within the . . . industry." *Air Transport*, 266 F.3d at 1072; *cf. Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232-33 (1995) (holding that the Airline Deregulation Act's preemption clause "stops States from imposing their own substantive standards with respect to rates, routes, or services" but does not prevent States from enforcing dispute resolution provisions in contracts signed by airlines); *Mendonca*, 152 F.3d at 1189 (holding that a State minimum wage statute did not affect rates, routes or services). ATA argues that the district court erred in examining the effect of each individual provision of the concession agreements, contending that "the requirement of a concession agreement *per se* affects routes and services" because it provides "POLA [the] ability to prohibit non-concessionaire LMCs from entering its property."

Our decision in *Air Transport* forecloses ATA's argument. 266 F.3d at 1071-72. *Air Transport* considered whether a city ordinance requiring that registered domestic partners be afforded treatment equal to spouses had an effect on the

routes of airlines.[9] *Id.* at 1069. The Airlines contended that the ordinance would require them to raise their rates or cease operating at San Francisco Airport due to increased costs. *Id.* at 1072, 1074. We held that because "[t]he Airlines [conceded] that they will use airport property in San Francisco regardless of the Ordinance . . . , the Ordinance cannot be said to compel or bind the Airlines to a particular route or service and there is no preemption under the connection-with test." *Id.* at 1074. The Airlines claimed that the ordinance presented a "Hobson's choice—either leave the Airport or do not discriminate." *Id.* We noted that air carriers were allowed "to make their own decisions about where to fly and how many resources to devote to each route and service." *Id.* Though the Airlines' decision to operate in San Francisco "may mean the Airlines will have to agree to abide by the Ordinance's non-discrimination requirements as a 'cost' of maintaining their leases at [San Francisco Airport]," that did not, in itself, mean the Ordinance was preempted. *Id.* "Hypothetically, there might be some contract term the City could demand whose costs would be so high that it would compel the Airlines to change their prices, routes, or services," but the San Francisco Ordinance "d[id] not approach that level." *Id.* at 1075 (*citing N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) for the proposition that "there may be a point at which costs from a [S]tate

---

[9]ATA argues that the concession agreements differ from the ordinance at issue in *Air Transport* because the latter did "not give the city discretion to decide which airlines could not serve the airport." ATA misreads *Air Transport*. The ordinance there said "[n]o contracting agency of the City . . . shall execute or amend any contract . . . with any contractor that discriminates in the provision of [benefits] . . . between employees with domestic partners and employees with spouses . . . ." 266 F.3d at 1069. The ordinance required the airport to establish that the airlines did not discriminate, and prohibited the airport from contracting with airlines that did, or executing pre-existing contracts. There is no meaningful distinction between the ordinance in *Air Transport* and the concession agreements, which also require the Port to ensure that concessionaires comply with certain requirements before entering Port property.

law are so exorbitant that it could rise to the level of a substantive mandate.").

**[2]** *Air Transport* establishes that a State may condition access to State property so long as the conditions do not impose costs that compel the carrier to change rates, routes, or services (for example by forcing the carrier to cease doing business with the State). Accordingly, the concession agreements do not *necessarily* affect rates, routes, or services simply because they impose conditions on entering Port property. The correct question is whether each condition binds motor carriers, directly or indirectly, to a particular rate, route, or service. We apply this law to specific provisions of POLA's concession agreements in part V of this opinion.

## B.   The Market Participant Doctrine

**[3]** The FAAA Act "preempt[s] only [S]tate regulation, and not actions a [S]tate takes as a market participant." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010); *Tocher*, 219 F.3d at 1049. In applying the market participant doctrine, we undertake "a single inquiry: whether the challenged program constitute[s] direct [S]tate participation in the market." *Reeves Inc. v. Stake*, 447 U.S. 429, 435 n.7 (1980) (internal quotation marks omitted); *see also Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (hereinafter *Boston Harbor*), 507 U.S. 218, 227-32 (1993) (considering whether the State was pursuing "proprietary interests").

ATA contends that the Port does not participate in the market because the concession agreements do not fall neatly within the two-prong test adopted by our circuit as a guide for determining whether the market participant doctrine applies. *Johnson*, 623 F.3d at 1023-24. The test was first developed in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999), and asks:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Id.*; *see also Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1084 (9th Cir. 2006) (en banc), *rev'd on other grounds sub nom. Chamber of Commerce v. Brown*, 554 U.S. 60 (9th Cir. 2008)(en banc) *and vacated by* 543 F.3d 1117 (2008). The first question "looks to the *nature* of the expenditure and protects comprehensive [S]tate policies with wide application from preemption, so long as the type of [S]tate action is essentially proprietary." *Johnson*, 623 F.3d at 1024 (internal quotation marks omitted) (quoting *Lockyer*, 463 F.3d at 1084). "The second question looks to the *scope* of the expenditure and protects narrow spending decisions that do not necessarily reflect a [S]tate's interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation." *Id.* (internal quotation marks omitted) (quoting *Lockyer*, 463 F.3d at 1084). If the answer to *either* question is yes, the market participant exception applies. *Id.*

The second prong of the *Cardinal Towing* test is not at issue here. The concession agreements are not "narrow spending decisions" that "lack the effect of broader social regulation." *Johnson*, 623 F.3d at 1024 (quoting *Lockyer*, 463 F.3d at 1084)(internal quotation marks omitted). "Narrow spending decisions" tend to be expressly limited in time and scope—for example, they apply to one city contract or to a number of contracts of a particular size and funded by a particular finite source. *See Id.* at 1028-29 (agreement limited to construction projects costing over $200,000, in a three-year period, and funded by specific initiative); *Sprint Spectrum LP v. Mills*,

283 F.3d 404, 421-21 (2d Cir. 2002) (contract applied only to one cellular phone tower located on particular property); *Cardinal Towing*, 180 F.3d at 694 (restrictions applied to single contract for police tows). Here, the concession agreements are not limited to contracts of a particular size or subsidized by State funds, and are not limited to drayage operations for a particular time. These factors indicate that the concession agreements do not fall within the narrow scope prong.

**[4]** Thus, we must consider whether the nature of the concession agreements is essentially proprietary. *Johnson*, 623 F.3d at 1024. ATA contends if the State's actions do not qualify as "efficient procurement," they cannot be considered proprietary.[10] We disagree.

The Supreme Court has applied the market participant doctrine to a case not involving "procurement" of goods. In *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 796-97 (1976), the Supreme Court upheld a Maryland policy penalizing in-state wreckers who kept abandoned vehicles on their property, and offering bounties to processors who scrapped vehicles formerly titled in Maryland. The Court held that Maryland's "payment of [S]tate funds—in the form of

---

[10]Contrary to ATA's assertion, neither the district court's decision at the preliminary injunction phase nor this court's affirmance of that decision are binding as law of the case. The district court concluded that "[a]lthough case law provides some conflicting indications, the Court finds that, on balance, plaintiff has a significant likelihood of showing that defendants are not participants in the relevant market." *ATA-I*, 577 F. Supp. 2d at 1120. We commended the district court's "cogent explanation" but offered no further analysis. *ATA-II*, 559 F.3d at 1053.

As a "general rule, our decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1114 (9th Cir. 2007) (internal quotation marks and citation omitted). "Any of our conclusions on pure issues of law, however, are binding." *Id.* Neither *ATA-I* nor *ATA-II* decided a "pure issue of law" with respect to the market participant doctrine, and their equivocal holdings on the *likelihood* that plaintiffs would prevail are not binding on this panel.

bounties—to encourage the removal of automobile hulks" was proprietary and did not violate the dormant commerce clause. *Id.* at 809. It stated that vehicles "remain within Maryland in response to market forces, including that exerted by money from the State." *Id.* at 810. Under *Alexandria Scrap*, procurement for governmental use is not the only way a State can participate in the market.

The first prong of *Cardinal Towing* is useful in cases where the government is buying goods or seeking services,[11] but it is not the be-all-and-end-all of proprietary action. *Cardinal Towing* acknowledged as much, noting that its questions "seek to isolate" those cases to which the market participant doctrine applies and help courts to "distinguish[ ] between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power." 180 F.3d at 693. If the State is not engaged in "efficient procurement" but nonetheless directly participates in the market in a proprietary manner, we see no reason why *Cardinal Towing* should preclude the application of the market participant doctrine. *Cf. Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 422 (3d Cir. 2011) (identifying "several questions a court should ask when conducting the 'single inquiry' to determine 'whether the challenged program constitute[s] direct state participation in the market' " and emphasizing that the questions must be considered in the "specific context" presented) (quoting *White v. Mass. Council of Constr. Emp'rs Inc.*, 460 U.S. 204, 208 (1983)).

**[5]** Here, the Port directly participates in the market as a manager of Port facilities. In essence, the concession agreements are contracts under which the Port exchanges access to its property for a drayage carrier's compliance with certain

---

[11]*See, e.g., Engine Mfrs. Ass'n v. S. Coast Air Quality Maint. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007) (the State was acting as a market participant when it required transportation vehicles purchased with State funds to meet environmental standards); *Tocher*, 219 F. 3d at 1049-50.

conditions. ATA contends that the Port's participation in the "port market" cannot extend to imposing restrictions on the "drayage market."[12] To be sure, the State does not act as a market participant *every time* it manages *any* of its property. *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 881-82 (9th Cir. 2006). In *Olympic Pipe Line*, for example, the City of Seattle was not acting as a market participant when it refused to renew a franchise agreement giving a right of way under city streets to a natural gas pipeline because the pipeline did not conduct tests at the behest of the city. *Id.* at 875-76, 882. We noted that, despite the city's claim that it was acting as a landlord, the city's "interest is not that of a private market participant that owns a pipeline or competes in the pipeline market *or a related market*." *Id.* at 881 (emphasis added). Rather, we stated that "Seattle in its sovereign capac-

---

[12]ATA argues that, in *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 97-98 (1984) (plurality), the Supreme Court limited the market participant doctrine to State actions taken in a "narrow" market defined by contractual privity. *Wunnicke* is not controlling precedent on this question. Its discussion of the market participant doctrine did not garner a majority of justices. *See id.* at 93-98 (majority op.); *id.* at 101 (Powell, J., in a concurrence in part and concurrence in the judgment joined by Burger, C.J.) (stating that they would remand to allow the Court of Appeals to apply the market participant doctrine in the first instance); *id.* at 101-103 (Rehnquist, J., in a dissent joined by O'Connor, J.) (arguing that the market participant doctrine applied). Indeed, *Wunnicke* is a perfect example of the Supreme Court's fractured views on the market participant doctrine. *See Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1056 (9th Cir. 1987).

Subsequent cases either distinguish *Wunnicke* as an outlier involving special considerations of natural resources, foreign commerce, and restrictions on resale, or cite *Wunnicke* for general positions of law not unique to its analysis. *See, e.g.*, *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 348 n.17 (2008) (responding to the dissent and distinguishing *Wunnicke* as a case involving three unique circumstances); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 340 n.4 (2007) (citing *Wunnicke* as an example of local-processing requirements invalidated by the Court); *Shell Oil*, 830 F.2d at 1057-58 (citing *Wunnicke* for the proposition that "contractual privity does not insulate a state or local body from commerce clause scrutiny").

ity owns the streets and land under which the Seattle Lateral [pipeline] runs, for the purpose of maintaining a transportation system" and the city sought to exercise its power to protect public health and safety. *Id.* at 882; *see also Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1057-58 (9th Cir. 1987) (holding that a city "is not a market participant . . . in deciding whether, or on what terms to grant a franchise for the use of city streets").

**[6]** In this case, we are not faced with a situation where the Port is managing property "in its sovereign capacity," or imposing restrictions unrelated to its business interests as a property manager. As the district court recognized, the Port of Los Angeles is a business entity, operating wholly separately from the city government. It is entirely self-sustaining and does not depend on city funds. Furthermore, the Port has a business interest in the drayage market. The Port's business is to provide a point of entry for ships to unload goods. The Port necessarily requires the interrelated service of drayage trucking in order to transport those goods to customers or points of forwarding. The district court found that (1) the "Port has a direct financial interest in the unhindered and efficient flow of cargo through its terminals and in increasing container traffic through the Port"; (2) the Port "needs to continually improve the efficiency of cargo operations at the Port to maintain its competitive position with respect to other ports and capture additional business"; and (3) a supply of drayage trucks and drivers is integral to cargo movement at the Port. ATA does not challenge those factual findings as clearly erroneous. Accordingly, we must conclude that even though the Port does not purchase drayage services, such services are an integral part of Port business. The drayage and port markets are so closely related that the Port's interest in managing its facilities can extend to imposing conditions on drayage carriers that operate on Port property.[13]

---

[13]Both parties discuss as persuasive authority cases from other circuits and district courts addressing the market participant doctrine in the general

**[7]** We hold that when an independent State entity manages access to its facilities, and imposes conditions similar to those that would be imposed by a private landlord in the State's position, the State may claim the market participant doctrine. Here, the Port leases its facilities to terminal operators, and permits drayage trucks to access its facilities, for the purpose of moving cargo through the Port and increasing Port revenues. The Port has a financial interest in ensuring that drayage services are provided in a manner that is safe, reliable, and consistent with the Port's overall goals for facilities management. A private port owner could (and probably would) enter into concession-type agreements with licensed motor carriers in order to further its goals. *See Boston Harbor*, 507 U.S. at 231-32. We therefore conclude that the Port acted in its proprietary capacity as a market participant when it decided to enter into concession agreements.

---

context of State facilities. *See Sprint Spectrum L.P.*, 283 F.3d at 420-21 (upholding under the market participant doctrine a school district's restrictions on cellular phone towers placed on school property); *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 912-13 (8th Cir. 1997) (holding that State restrictions on rental car operators that leased airport terminal counter space fell within the market participant doctrine); *Smith v. Dep't of Agric.*, 630 F.2d 1081, 1083 (5th Cir. 1980) (holding that preferential placement for local farmers at a State-run farmers market did not fall within the market participant doctrine); *Aeroground, Inc. v. City & Cnty. of San Francisco*, 170 F. Supp. 2d 950, 958-59 (N.D. Cal. 2001) (holding for the purposes of a preliminary injunction that an airport was not acting as a market participant when it adopted a rule requiring employers operating at the airport to permit certain union actions); *Transp. Limousine of Long Island, Inc. v. Port Auth. of N.Y. & N.J.*, 571 F. Supp. 576, 581 (E.D.N.Y. 1983).

Factually, those cases are distinguishable, so any analogy to the holdings would be strained. *Cf. Tri-M*, 638 F.3d at 422 (the court must consider the government's actions in the specific context presented). These cases are useful only to illustrate that other courts examine whether a particular provision is actually related to the State's proprietary interest in managing its facilities, or whether it reflects the State's regulatory interest in unrelated industries.

We stop short, though, of holding that every provision of the concession agreements is saved from preemption. The Supreme Court has placed limitations on what a State, acting as a market participant, may do. "[W]here the [S]tate seeks to affect private parties' conduct unrelated to the performance of contractual obligations to the [S]tate," the State's actions are "tantamount to regulation." *Johnson*, 623 F.3d at 1025-26 (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.,*475 U.S. 282, 289 (1986); *see also Chamber of Commerce v. Brown*, 554 U.S. 60, 70 (2008). Accordingly, we must examine whether the provisions at issue further the State's interests as a facilities manager, or whether the provisions seek to affect conduct unrelated to those interests. The State's avowed purposes may be relevant, but we need not inquire into the State's undisclosed intentions. *See Gould*, 475 U.S. at 288 (examining the State's admitted motives); *Johnson*, 623 F.3d at 1026 (refusing to examine the State's "ulterior motives"). We do not examine each individual provision of the concession agreements at this point, saving that discussion for part V of this opinion.

## C.   Safety Exception

Finally, we consider whether the district court identified the correct legal principles in applying the safety exception to FAAA Act preemption. ATA argues that, notwithstanding the express safety exception of 49 U.S.C. § 14501(c)(2)(A), the Port has no authority to "revoke a motor carriers' ability to engage in interstate commerce." It argues that in *Castle*, 348 U.S. 61, the Supreme Court held that if interstate motor carriers violate the safety laws of the State, it is up to the federal government to "protect the State's interest" through federal enforcement proceedings. Thus, according to ATA, at the time the FAAA Act was passed, the State's regulatory authority did not permit it to revoke the ability of motor carriers to engage in interstate commerce. ATA argues that the safety provision incorporates the then-existing regulatory authority

of a State, and simply does not grant the States "independent power to make safety-related revocations."

*Castle* does not, however, stand for the proposition that the States have no power to limit motor carrier access to particular land in order to further safety. In *Castle*, Illinois punished freight carriers that repeatedly violated State limits on the weight of commercial trucks by totally suspending the carriers' right to use Illinois state highways for up to one year. 348 U.S. at 63. At the time, the Interstate Commerce Commission had the exclusive right to issue and revoke certificates permitting motor carriers to operate interstate. *Id.* at 63-64. The Court held that Illinois's action was "the equivalent of a partial suspension of [a motor carrier's] federally granted certificate," because Illinois highways were used "to transport interstate goods to and from [Illinois and] are also used as connecting links to points in other states." *Id.* at 64. Accordingly, Illinois's action was prohibited. *Id.* at 65. The Court stated, though, that Illinois remained free to impose "conventional forms of punishment" on over-weighted or improperly loaded motor trucks. *Id.* at 64. The Court also made clear that it "know[s] of no reason why the Commission may not protect the [S]tate's interest, either on the Commission's own initiative or on complaint of the [S]tate." *Id.* at 65. It did not, as ATA asserts, hold that *only* the federal government may impose punishment for a motor carrier's violation of State safety regulations.

**[8]** Even if the FAAA Act incorporated (rather than modified) *Castle*'s limitations on the State's authority,[14] *Castle* does not preclude the Port from permitting access only to motor carriers that comply with its safety restrictions. Unlike a ban on using *all* of a State's freeways, a limitation on access to a single Port does not prohibit motor carriers from participating in "transport [of] interstate goods to and from that State" or eliminate "connecting links to points in other states."

---

[14]We express no opinion on this point.

*Id.* at 64. While a denial of access to the Port may have more effect on motor carriers than a traditional fine, it does not rise to the level of the comprehensive ban at issue in *Castle*.

**[9]** The district court did not err in applying the safety exception to this case. In addition, it correctly concluded that the safety exception is available only when a regulation is "genuinely responsive to safety concerns." *City of Columbus*, 536 U.S. at 442; *ATA-II*, 559 F.3d at 1053-54. The district court rightly examined the avowed intent of the government, and considered whether any " 'purported safety justifications' will withstand scrutiny." *ATA-II*, 559 F.3d 1055 (quoting *Auto Club of N.Y., Inc., v. Dykstra*, 520 F.3d 210, 215 (2d Cir. 2008) (per curiam)). In sum, we determine that the district court correctly identified the applicable law.

## IV.

With these principles in mind, we analyze whether, and on what grounds, each challenged provision is subject to preemption by the FAAA Act. We agree with the district court that the financial capability provision has only a tenuous and remote connection to rates, routes, or services, so is not preempted by § 14501(c) of the FAAA Act. We also agree with the district court that the maintenance provision is intended to be and is genuinely responsive to safety, so is not preempted. We conclude that the off-street parking and placard provisions were adopted to address specific proprietary concerns faced by the Port as a facilities manager and do not seek to affect unrelated conduct by third parties, so fall under the market participant doctrine. We hold, however, that the employee-driver provision is pre-empted because it is tantamount to regulation.

### A.   Financial Capability Provision

The financial capability provision requires a concessionaire to "demonstrate[ ] to the satisfaction of the Executive Director

that it possesses the financial capability to perform its obligations under th[e] Concession." As with the maintenance provision, the district court held that the provision did not relate to rates, routes, and services in more than a tenuous way. It concluded, however, that the provision was not genuinely responsive to safety. We agree with the district court that the financial capability provision does not relate to rates, routes, and services in a more than tenuous fashion, and is not preempted; we therefore do not apply the market participant doctrine or safety exception.

[10] The financial capability provision does not directly impact the drayage services provided to customers (for example, picking up and transporting cargo). Nor does it directly regulate the routes served or the prices charged. *Cf. Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 931-32 (9th Cir. 2003) (a State's regulation of payment method does not relate to the tow truck operator's route or service and is not preempted by § 14501(c)). Thus, we must consider whether the financial capability provision indirectly binds drayage carriers to particular rates, routes, or services. *Air Transport*, 513 U.S. at 1075. ATA argues only that the provision "gives POLA discretion to deny LMCs the right to provide drayage services on routes involving the Port"—apparently, that the financial capability provision *could* be used by the Port to deny access to otherwise qualified drayage carriers and thus affect routes. The district court disagreed, and its conclusion is well supported by the record. The Port has never refused to sign a concession agreement on the basis of the financial capability provision, and the motor carriers who testified indicated that the financial capability provision would not change their operations. While this does not preclude the *possibility* that the financial capability provision will effect rates, routes or services, it makes that possibility "tenuous or remote." *Rowe*, 552 U.S. at 371. Accordingly, we hold that the financial capability provision is not preempted by § 14501(c) of the FAAA Act.

## B.   The Maintenance Provision

[11] The maintenance provision makes concessionaires "responsible for vehicle condition and safety" and requires them to "ensure that the maintenance of all Permitted Trucks . . . is conducted in accordance with manufacturer's instructions." The district court held that the maintenance provision was not preempted by the FAAA Act because it does not have more than an indirect, remote, or tenuous effect on rates, routes, or services. Alternatively, the district court concluded that, even if subject to preemption, the maintenance provision was genuinely responsive to safety concerns. Even assuming that the maintenance provision relates to rates, routes, and services,[15] we agree with the district court that the provision was intended to be and is genuinely responsive to safety and is thus exempt from preemption by the FAAA Act.

We conclude that the maintenance provision was intended to respond to safety concerns. The Port cited concerns about vehicle safety (including vehicle maintenance, repair and replacement, and driver safety) as motivations for adopting the concession agreements. The Port also "found that serious safety and security problems existed in connection with drayage trucks at the Port" and cited statistics indicating that heavy duty vehicles accounted for a disproportionate share of

---

[15]Though we do not rest our holding on this ground, we agree with the district court that the maintenance provision has only a tenuous and remote connection to rates, routes, and services. Requiring regular maintenance of trucks does not directly affect drayage pickups or deliveries, nor does it bind motor carriers to particular routes or types of services. Though one would suspect that maintenance could have a connection to costs and thus rates, the evidence introduced at trial established that the maintenance provision has not given rise to any significant additional costs and that concessionaires have not increased their rates as a result of complying with the provisions. ATA does not challenge as clearly erroneous the district court's factual finding that the maintenance provision has not changed the rates charged by motor carriers, further supporting our view that the maintenance provision is not related to rates and not preempted by the FAAA Act.

traffic violations, accidents, and citations for improper maintenance.

**[12]** ATA correctly notes that the maintenance provision was also motivated by environmental concerns. In particular, the Port wanted to ensure that all drayage trucks, including those purchased or retrofitted with State funds, continued to meet emissions standards over time. The presence of such mixed motives, though, does not preclude the application of the safety exception, provided that the State's safety motives are not pre-textual. *Cf. Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145-47 (2d Cir. 2006). For example, in *Loyal Tire*, the city passed a towing ordinance with a broad general statement that towing regulations as a whole were in the public interest. *Id.* at 146. At the same time, there was significant evidence in the legislative history that the statute had been passed in order to discriminate against a particular out-of-town towing company. *Id.* at 146-47. Though the State alleged that it was actually responding to safety, it didn't document any safety issues until after litigation commenced. *Id.* at 146. In addition, there was no logical relationship between at least one of the city's purported safety justification and the measure at issue. *Id.* at 147- 48. In light of this record, the court held that the city's purported safety justification did not withstand scrutiny. *Id.* at 148. Unlike *Loyal Tire*, nothing in the record here demonstrates that the Port's safety motives are illusory or pretextual—the Port's safety motivation is genuine, albeit operating in tandem with its other concerns. *Cf. Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 774 (2d Cir. 1999) (stating that because "it is difficult to treat these programs as a guise for economic regulation" the programs were "sufficiently safety-oriented to survive preemption under § 14501(c)).

We also agree with the district court that the maintenance provision is genuinely responsive to safety, because "requiring routine truck maintenance will no doubt help to ensure that drayage trucks are operating properly and safely, which

will in turn likely prevent motor vehicle accidents." Again unlike in *Loyal Tire*, there is a logical connection here between the maintenance provision and motor vehicle safety. ATA argues that the maintenance provision is not genuinely responsive to safety because the Port has not demonstrated that requiring motor carriers to "comply with manufacturers' instructions" creates safety benefits *in addition* to those already created by federal law. In other words, according to ATA, because regular maintenance is already required by federal law, the Port must demonstrate that the non-duplicative portion of the maintenance provision—the requirement to comply with manufacturer's instructions—has an independent safety benefit.

[13] We hold that State provisions duplicating federal law may still be genuinely responsive to safety. At the preliminary injunction phase of this case, we "reject[ed] ATA's contentions that the provisions are not safety-related simply because they duplicate already-existing federal laws." *ATA-IV*, 596 F.3d at 606. Our conclusion comports with the Supreme Court's decision in *City of Columbus*. One of the arguments raised in *City of Columbus* was that the safety exception should not extend to municipalities because each one could adopt different regulations, which would be needlessly duplicative and burdensome. 536 U.S. at 441-42. The Court declined to adopt such a broad rule; instead, it noted that 49 U.S.C. § 31141 authorizes the Secretary of Transportation to void any State law that "has no safety benefit" and thus permitted the federal government to invalidate local safety regulations "upon finding that their content or multiplicity threatens to clog the avenues of commerce." 536 U.S. at 442.

[14] Duplicity is not the death knell of a safety-related regulation. Because provisions that duplicate federal law may still have a safety benefit, we hold that the Port need not demonstrate that the requirement to comply with manufacturer's instructions creates safety benefits over and above those cre-

ated by federal law. The maintenance provision falls within the safety exception and is not preempted.

### C.   Off-Street Parking Provision

[15] The off-street parking provision requires concessionaires to submit for approval a "plan that includes off-street parking locations for all Permitted Trucks" and requires concessionaires to ensure that Permitted Trucks are "in compliance with parking restrictions by local municipalities." The district court held that the provision would probably affect motor carriers' rates, because the carriers would incur high costs in obtaining off-street parking and be forced to pass those costs on to consumers. It also concluded that the off-street parking provision was not genuinely responsive to safety because the Port adopted the provision to mollify community opposition, rather than to address existing safety concerns. The Port does not challenge either of these holdings on appeal, so the off-street parking provision must rise or fall on the applicability of the market participant exception. The district court was correct that the concession agreements, as a whole, were adopted by the Port in its proprietary capacity as a facilities provider. The real issue is whether the off-street parking provision was adopted to further specific proprietary goals, or whether it is thinly-veiled regulation.

The Supreme Court confronted a case of thinly veiled regulation in *Gould.* 475 U.S. at 287-89. There, Wisconsin forbade its procurement agents to purchase any product manufactured or sold by any firm on a State-maintained list of repeat violators of the National Labor Relations Act (NLRA). *Id.* at 283-83. "[O]n its face the debarment statute serve[d] plainly as a means of enforcing the NLRA" and the State conceded that its point was "to deter labor law violations and to reward 'fidelity to the law.' " *Id.* at 287. The Court held that Wisconsin "simply is not functioning as a private purchaser of services," but instead attempting to impose a supplemental sanction for violations of the NLRA that "conflicts with the

[federal government's] comprehensive regulation of industrial relations." *Id.* at 288. The Court did not believe that Congress would permit a State to interfere with that scheme "as long as [the States] did so through exercises of the spending power." *Id.* at 290. The Court explained that " '[i]t is the conduct being regulated . . . that is the proper focus of concern.' " *Id.* at 289 (quoting *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 292 (1971)).

**[16]** Unlike the provision in *Gould*, nothing on the face of the off-street parking provision indicates it was designed to circumvent the restrictions of the FAAA Act by disguising impermissible regulation as proprietary. Rather, the off-street parking provision and the documents adopting it indicate that it was designed to address specific proprietary problems. Prior to the enactment of concession agreements, community members complained that drayage trucks regularly parked in surrounding neighborhoods, posing safety and health risks. The Port believed that off-street parking would mitigate drayage trucks' negative impacts and increase the community goodwill necessary to facilitate Port expansion. Enhancing goodwill in the community surrounding the Port is an important and, indeed, objectively reasonable business interest, particularly since the community has already proved its ability to stymy Port growth and operations by pursuing litigation over health hazards and environmental impacts.

Further, maintaining Port security is an important business interest of the Port. The district court found that the Department of Homeland Security considers the Port part of one of seven " 'Group I' port areas at the highest risk of terrorist attacks." Jeffrey Brown, an expert in port security, testified that the off-street parking provision was "safety related" because, for example, parking vehicles carrying hazardous cargo on the street creates safety risks. The off-street parking provision therefore serves the Port's business interest in promoting Port security. Nor does the off-street parking provision reach beyond the Port's participation in the market as a

facilities provider and seek to impact the private behavior of third parties. The provision binds only those motor carriers operating on Port property, and applies to only those trucks permitted to operate at the Port. It is tailored to a specific proprietary problem facing the Port.

[17] ATA argues that there were alternative ways for the Port to placate community concerns about truck parking; for example, by lobbying the city to change parking regulations, or by deploying Port police as agents of the city to enforce existing regulations. The fact that the State could have achieved its goals through regulation does not bear on the question of whether the Port's chosen means were regulatory or proprietary. Because the Port imposed the off-street parking provision only on those drayage trucks operating on Port property, and did so in response to perceived business necessity, we hold that the off-street parking provision falls within the market participant doctrine.

## D.   Employee-Driver Provision

The employee-driver provision requires all concessionaires to gradually cease using independent owner-operators for Port drayage. At the end of a five year period, each Port drayage driver must be an employee of a licensed motor carrier. The district court held that the provision was preempted by the FAAA Act as related to rates, routes and services, and rejected the Port's argument that the provision was safety related. The Port does not challenge those holdings on appeal, so the employee-driver provision survives preemption only if it falls within the market participant doctrine.

The Port adopted the employee-driver provision for a number of reasons. The record is replete with evidence that the provision was designed to "ensure sufficient supply of drayage drivers by improvement of wages, benefits, and working conditions."[16] Essentially, the Port wanted to ensure that

---

[16]In assessing the Port's motivations, we focus exclusively on the orders and published documents issued by the Port, and on statements made at

motor carriers would provide higher wages to drivers, thus enabling them to attract drivers to replace those lost through the TWIC program. In addition, the Port believed that the employee-driver provision would "protect the Port's investment in clean trucks" because it created an employer-employee relationship between truck drivers and subsidized concessionaires, ensuring that the trucks were owned and operated by persons with the means to maintain them. The Port also indicated that the employee-driver provision would be "easier to administer" because it would shift from the Port to employers the burden of maintaining records on each driver. *ATA II*, 559 F.3d at 1056.

**[18]** We conclude that, under *Gould*, the employee driver provision seeks to impact third party behavior unrelated to the performance of the concessionaire's obligations to the Port. One of the Port's primary motives in adopting the employee driver provision was to increase stability in Port drayage by ensuring that drivers were paid higher wages. As a facilities provider, the Port has an interest in continued provision of drayage services, but it may not obtain that stability by unilaterally inserting itself into the contractual relationship between motor carriers and drivers. The Port, unlike the governmental entities in *Boston Harbor* or *Johnson*, does not pay driver salaries or subsidize benefits, so has no connection with drayage drivers justifying interference with the drivers' employment relationships. *Cf. Boston Harbor*, 507 U.S. at 231-32 (emphasizing that the State could require project labor agreements as a purchaser of construction services); *White*, 460 U.S. at 214 (holding that the city was entitled to the market participant

_____

trial by high-ranking Port officials. Both ATA and its amicus imply that statements of consultants hired by the Port reflect the Port's motivations. This argument is without merit, even though both reports were commissioned by the Port, and the Port ultimately adopted the course recommended by both reports. The consultants are not agents of the Port, and it is too much to conclude that every statement in each report was adopted by the Port or accurately reflects the Port's motivations.

doctrine because it expended its own funds in contracting for construction of public projects); *Johnson,* 623 F.3d at 1029-30 (noting that the State could require parties to maximize opportunities for minority and women-owned businesses as consideration for the benefits received from the State). While the Port may impose conditions on licensed motor carriers seeking to operate on Port property, it cannot extend those conditions to the contractual relationships between motor carriers and third parties.

The Port argues that it subsidized approximately 35% of the drayage trucks operating at the Port, and believes that employee-drivers will better protect that investment. But the concession agreements bind all licensed motor carriers operating at the Port, not merely those who drive Port-subsidized trucks. Accordingly, even assuming that the Port's investment in drayage trucks entitles it to control the employment status of the drivers of subsidized trucks, the employee-driver provision still seeks to impact behavior beyond the scope of the obligations imposed by the subsidies. *Cf. Wyo. v. Okla.*, 502 U.S. 437, 456 (1992) (holding that a State which owned and operated an electricity plant did not act as a market participant in requiring all plants to use at least 10% Oklahoma coal).

**[19]** We recognize that a facilities provider in the Port's position has a proprietary interest in streamlined administration. We also recognize that the employee-driver provision furthers this interest, because it permits the Port to hold accountable a smaller number of licensed motor carriers, rather than having to monitor a large number of independent owner-operators. Nevertheless, under the circumstances, this is insufficient to outweigh the Port's avowed desire to impact wages not subsidized by the State. The employee-driver provision is "tantamount to regulation" and thus does not fall under the market participant exception. *Gould*, 475 U.S. at 289.

### E.   Placard Provision

Lastly, the placard provision requires concessionaires to "post placards on all Permitted Trucks" when the trucks are "entering and leaving Port property and while on Port property." The placards shall "refer[ ] members of the public to a phone number to report concerns regarding truck emissions, safety, and compliance to the Concession Administrator and/or authorities." Since April, 2009, the Port has provided sticker placards to motor carriers, although Permitted Trucks are allowed to use other placards.

[20] The placard provision may be preempted by § 14501(c) of the FAAA Act, prohibiting regulations related to motor carriers' rates, routes, and services. We agree with the district court that the placard provision is genuinely responsive to motor vehicle safety, so not preempted by § 14501(c).[17] The placards help the Port to gather information about the safety of drayage truck operations, both on and off Port property. This information can be communicated to motor carriers and informs the Port's operations. The fact that many drayage trucks continue to display the placards off Port property (although nothing in the provision requires them to do so), and that community members have reported off-Port safety violations, does not diminish the placards' safety benefit.

[21] Though it survives preemption by § 14501(c) because of the safety exception, the placard provision may be preempted by 49 U.S.C. § 14506(a), which prevents States from enacting or enforcing any "provision having the force and

---

[17]As discussed in section IV.C *supra*, application of the FAAA's safety exception is not precluded by *Castle v. Hayes*, 348 U.S. 61 (1954). The placard provision is a reasonable measure aimed at promoting Port safety, which applies only while trucks are operating on the Port's private property. It is not comparable to Illinois' attempt to bar certain federally licensed motor carriers from its state highways, which was at issue in *Castle*.

effect of law that requires a motor carrier . . . to display any form of identification on or in a commercial motor vehicle . . . other than forms of identification required by the Secretary of Transportation." The district court erroneously concluded that the placards are not a "form of identification" because they merely list a phone number. The phone number, though, identifies the truck as one serving the Port, and falls within the broad scope of § 14506(a).

**[22]** There is no safety exception to § 14506(a), *ATA-IV*, 596 F.3d at 606, but because it applies only to provisions having the force and effect of law, § 14506(a) does not apply to State proprietary action. *Cf. Cardinal Towing*, 180 F.3d at 695. The placard provision is proprietary in nature, and, under the market participant doctrine, is not preempted by § 14506(a). The Port adopted the placard provision in response to community concerns about drayage truck operation. The provision invites community participation and increases goodwill, thus facilitating Port expansion. As a facilities provider, the Port has a proprietary interest in receiving complaints about drayage trucks entering, leaving, and operating on its property. A private facilities provider would do the same. *Cf. Boston Harbor*, 507 U.S. at 231-32. The placard provision does not seek to impact third party behavior unrelated to the performance of contractual obligations to the State, but is concerned only with drayage truck operations immediately connected to the Port. Thus, it is not preempted.

## V.

The district court meticulously identified and applied the governing law. We affirm the district court's holdings that the financial capability, maintenance, off-street parking, and placard provisions are not preempted. We reverse the district court's conclusion that the employee-driver provision is saved from preemption by the market participant doctrine, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART AND REVERSED IN PART

---

N.R. SMITH, Circuit Judge, dissenting in parts III.B., III.C., IV.B., IV.C., and IV.E. of the majority opinion:

I must dissent from the majority opinion because: (1) the market participant exception to preemption does not apply. Drayage services (not port services) form the relevant market, and the Port of Los Angeles (the "Port") acts as a regulator of drayage services. (2) Even assuming the Port qualifies as a proprietor, the off-street parking provisions are preempted, because they affect parties unrelated to contractual obligations to the Port. (3) The placard provision is preempted and not saved by the market participant doctrine or the safety exception, because California cannot revoke access to channels of interstate commerce and identification requirements on motor carriers are expressly preempted under 49 U.S.C. § 14506(a).

## I.  Market Participant Exception

The Port acts as a regulator (rather than a market proprietor) of drayage services. It is therefore ineligible for the "market participant" defense to federal preemption. We apply a two-prong test for distinguishing proprietary from regulatory actions:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023-24 (9th Cir. 2010) (citation omitted). If the answer to *either* question is yes, the market participant exception applies. *Id.* at 1024.

The Port's regulation of drayage services does not qualify as "efficient procurement" of needed services. The Ninth Circuit has no controlling precedent on this point. However, the Fifth Circuit, in *Smith v. Department of Agriculture of the State of Georgia,* concluded that mere ownership of a facility does not make the government a participant in the markets operating in that facility. 630 F.2d 1081 (5th Cir. 1980); *cf. Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1057-58 (9th Cir. 1987) (holding that a city "control[ling] easements in the area beneath city streets, a commodity with value . . . . [with which] the city competes with other entities[,] . . . is not a market participant in the setting of franchise fees for easements under public streets"). In *Smith*, the Fifth Circuit held that Georgia acted as a market regulator when it leased booths to farmers at a state-owned-and-operated farmer's market that gave preferential treatment to Georgia farmers. Georgia acted as a *regulator*, rather than a proprietor, because it (1) did not "produce the goods to be sold at the market," (2) did not "engage in the actual buying or selling of those goods," and (3) had "simply provided a suitable marketplace for the buying and selling of privately owned goods." *Id.* at 1083. As the district court in this case suggested in an earlier order, *Am. Trucking Ass'ns., Inc. v. City of L.A.*, 577 F. Supp. 2d 1110, 1120 (C.D. Cal. 2008), and a concurring judge in *Smith* emphasized, the outcome of this test depends on the definition of the market: "[i]f the market is . . . one in sale booths for produce, then Georgia [is a proprietor] of booths. . . . But [because] the relevant market [is] one in vegetables, . . . [and] Georgia is not their producer or seller," Georgia is not a proprietor. *Smith*, 630 F.3d at 1086 (Gee, J., concurring).[1]

---

[1]Also not controlling but persuasive is the case of *Fla. Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F.Supp.2d 1260 (S.D. Fla. 2010). In *Flor-*

18236 AMERICAN TRUCKING ASSOCIATIONS V. LOS ANGELES

The majority states that the "efficient procurement" prong "is useful in cases where the government is buying goods or seeking services, but it is not the be-all-and-end-all of proprietary action." Maj. Op. at 18216 (footnote omitted). Instead, the real inquiry is distinguishing between propriety and regulatory action. *See id.* In determining whether actions are "as a market participant or regulator, a court must examine whether the . . . government has imposed restrictions that 'reach beyond the immediate parties with which the government transacts business.' " *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.2d 1173, 1178 (9th Cir. 1992) (citing *White v. Mass. Council of Constr. Emp'rs*, 460 U.S. 204, 211 n.7 (1983) and *S.-Cent. Timber Dev. v. Wunnicke*, 467 U.S. 82, 95 (1984)).[2] "In *White*, . . . Boston did not reach beyond the immediate parties by requiring contractors to hire local workers because everyone affected by the order was, 'in a substantial if informal sense, working for the city.' " *Id.* (citing *White*, 460 U.S. at 211 n.7). "In contrast, the Court in *Wunnicke* found that the Alaska timber processing requirement constituted a 'downstream' regulation prohibited by the commerce clause." *Id.* (citing *Wunnicke*, 467 U.S. at 95).

Here, the Port reaches beyond the immediate parties with whom it transacts, because it does not transact business with drayage service providers. Unlike the rules requiring contractors to hire local workers in *White*, the Port does not require the shipping lines and stevedoring companies (that rent terminals) to regulate the drayage service providers. Further, the

_____

*ida Transportation* the plaintiffs challenged the Port of Miami's limitation on the number of stevedores. *Id.* Regarding the market participant doctrine, the court found the county operating the Port of Miami not to be in the market of stevedoring just because it participates in the market for port services. *Id.* at 1282 ("[T]he county simply provides a suitable market place that it owns—the Port—for stevedores to offer their services.").

[2]Although *Wunnicke*, 467 U.S. 82 (1984), is a plurality opinion, we cited its holding with approval in *Big Country Foods*, 952 F.2d at 1178.

drayage service providers do not, even in an informal sense, work for the Port. *See White*, 460 U.S. at 211 n.7. Therefore, the Port reaches the limits of the market participation exemption. *Id.* (privity of contract is not the boundary of the market participation exemption, but "there are some limits on a . . . government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business.").

The provision of maritime ports does not form the relevant market here; rather, the market is the provision of drayage services. The Port cannot be a proprietor in this market, because it neither purchases nor provides drayage services.[3] Indeed, the Port does not involve itself in *any* market activity with the independent contractors and companies providing drayage services. *See* Amicus Brief of the Center of Constitutional Jurisprudence 11-12. Therefore, the Port regulates third-party drayage providers in its capacity as a regulator, eliminating the Port's eligibility for the market participant defense.

## II.  Safety Exception

The majority applies the safety exception in this case by distinguishing *Castle v. Hayes Frieght Lines*, 348 U.S. 61 (1954), and finding that it does not preclude the Port from banning access of motor carriers. Maj. Op. at 18220-22.

---

[3]In virtually every Ninth Circuit case finding that a government entity acted as a market proprietor, the government was actually participating in the marketplace by purchasing goods or services. *See, e.g.*, *Engine Mfrs. Ass'n v. S. Coast Air Quality*, 498 F.2d 1031 (9th Cir. 2007) (holding that a state subdivision acted as a market participant in establishing air quality rules governing state and local governments' procurement of new fleet vehicles); *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1049 (9th Cir. 2000) (holding the City of Santa Ana acted as a market participant in "establishing rules and regulations to guide the formation of contracts for towing services provided exclusively to the City" (emphasis added)).

In *Castle*, the Supreme Court held that Illinois could not revoke an interstate motor carrier's *access* to state highways for repeatedly violating the state highway regulations, because the federal government has assumed exclusive authority over the licensing of interstate motor carriers. 348 U.S. at 63-64. The Court explained that it would be "odd if a state could take action amounting to a suspension or revocation of an interstate carrier's [federal government]-granted right to operate." *Id.* at 64. The Court further elaborated that

> [i]t cannot be doubted that suspension of this common carrier's right to use Illinois highways is the equivalent of a partial suspension of its federally granted certificate. The highways of Illinois are not only used by Hayes [Freight Lines] to transport interstate goods to and from that State but are also used as connecting links to points in other states which the Commission has authorized Hayes to serve. Consequently if the ninety-day or the one-year suspension should become effective, the carriage of interstate goods into Illinois and other states would be seriously disrupted.

*Id.* Although the state could not *revoke access* to its highways for operators who repeatedly violated the state's size and weight restrictions, the state could still (1) resort to "conventional forms of punishment" and (2) rely on *federal* authorities to protect the state's interest by mandating compliance with state regulations.[4] *Id.* at 64-65.

---

[4]California recognized this enduring limit on its authority to regulate interstate motor carriers when it enacted the Motor Carrier Safety Improvement Act of 1996. The Act provides, in part, that if the California Highway Patrol determines a commercial carrier has engaged in "consistent failure" to comply with safety requirements "so as to justify a suspension or revocation of the motor carrier's motor carrier permit . . . *for interstate operators*, the [Highway Patrol] shall *recommend* to the Federal Motor Carrier Safety Administration that appropriate administrative

The Port does not dispute that the federal government continues to issue interstate transportation "registrations" or "permits" enabling trucking companies to transport cargo across state lines so long as they comply with federal safety and insurance regulations. *See, e.g.*, Motor Carrier Safety Act, Pub. L. No. 98-554, 98 Stat. 2829 (codified, in part, at 49 U.S.C. § 31144); Trucking Industry Regulatory Reform Act of 1994, Pub. L. No. 103-311, § 201, 108 Stat. 1683.[5] Thus, the preemption analysis in *Castle* still applies, even if the form of comprehensive federal regulation has changed over the years.[6] Additionally, contrary to the district court's holding, drayage operations between the Port of Los Angeles and other points (even within California) constitute interstate commerce. They are part of the continuous flow of goods between locations *outside* California and customers *within* California. *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) ("Whether any particular shipment is interstate is

---

actions be taken against the carrier . . . ." Cal. Veh. Code § 34505.6(a) (emphasis added). This enforcement scheme is consistent with *Castle* in that California relies on federal authorities to revoke an interstate offender's permit where the state would otherwise revoke an *intra*state offender's transportation permit for the same conduct.

[5]The district court concluded, without analysis, that *Castle* does not apply, because the FAAA Act was enacted 40 years after *Castle*. However, the FAAA Act did not expand states' authority to regulate interstate motor vehicles, even on safety grounds. In addressing this very question, Congress explained that "nothing in these new subsections contains a new grant of Federal authority to a State to regulate commerce and nothing in these sections amends other Federal statutes that govern the ability of States to impose safety requirements . . . ." H.R. Rep. No. 103-677 at 84 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1757.

[6]The United States, writing as amicus curiae in this case, also argued that *Castle* and its progeny are still in full effect, explaining "the Supreme Court has recognized that 'comprehensive federal regulation precludes state or local entities from 'exercising any veto power over' interstate commerce service providers.' " *See* Motion Granting in Part and Denying in Part Plaintiff's Motion on Remand for Entry of Preliminary Injunction, Case No. 2:08-cv-04920-CAS-CT, Dkt. No. 155, at 6 (citing *Castle*, 348 U.S. at 64).

determined . . . by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of shipment*, and is ascertained from all of the facts and circumstances surrounding the transportation." (internal quotation marks and citation omitted) (emphasis in original)).

Therefore, interstate drayage operations are the regulatory province of the federal government. California agencies may promulgate safety regulations for drayage operators and may utilize "conventional forms of punishment" for violating these regulations (e.g., fines). However, *revoking access*, under *Castle*, is an enforcement mechanism beyond the reach of California and its political sub-parts, including the Port.

The opinion attempts to distinguish *Castle*, because a limitation on access to a single Port does not prohibit the motor carriers from participating in transport of interstate goods to and from the state or rise to the level of the comprehensive statewide ban at issue in *Castle*. Maj. Op. at 18221-22. However, the ban in *Castle* did not "prohibit" offending motor carriers from participating in interstate commerce or "eliminate" connecting links to other states. Instead, as the Supreme Court characterized it, the ban (1) "partially suspended" the motor carrier's federally granted permit to travel interstate, and (2) "seriously disrupted" (rather than "eliminated") the motor carriers' carriage of goods into Illinois and other states. There were obviously alternatives available to carriers in *Castle*, whose state licenses were suspended, but the state enforcement scheme placed impermissible burdens on a federally-regulated *interstate* commercial activity. The same problem arises in this case. Barring access to the Port of Los Angeles —the largest port in the United States and one of only a handful of large commercial deep-water ports on the West Coast— would no doubt "seriously disrupt" drayage carriers' ability to transport goods from ships to other destinations in and outside California. Indeed, barring access is a "partial suspension" of

drayage carriers' federal permits to transport goods in the stream of interstate commerce.

Thus, although the Port can avail itself of the traditional remedies discussed in *Castle*, it cannot step into the shoes of the federal government and partially revoke drayage carriers' access to the channels of interstate commerce. Therefore, the Port cannot justify any of the challenged regulations on the basis of safety. California's safety regulations cannot disrupt Federal authority over interstate travel of motor carriers.

## III.   Off-street Parking Provisions

Even if the Port qualified as a proprietor, the off-street parking provisions do not qualify as "efficient procurement" of services. The Port "seeks to affect private parties' conduct unrelated to the performance of contractual obligations to the [Port]." *Johnson*, 623 F.3d at 1026. The off-street parking provisions attempt to address political concerns the Port alleges local community members have raised regarding drayage truck parking practices, which are not related to any contracts between drayage providers and the Port.

The off-street parking provisions cannot survive preemption, either because (1) the Port is not acting as a market participant in the "efficient procurement" of services simply by virtue of its ownership of Port facilities, or (2) the agreement's far-reaching provisions affect conduct beyond any direct obligations of drayage providers to the Port.

## IV.   Placard Provision

### A.   Preemption under 49 U.S.C. § 14501(c)

The placard provision (requiring concessionaires to post placards on all drayage trucks when the trucks are "entering and leaving Port property and while on Port property") may be preempted under 29 U.S.C. § 14501(c), if it relates to

motor carriers' prices, routes, and services. The majority does not determine whether the placard provision relates to prices, routes or services because of its reliance on the safety exception to overcome preemption. Maj. Op. at 18232. However, this provision is not saved by the safety exception (as the majority concludes), because the state cannot impede Federal authority to allow motor carriers access to interstate travel, as noted above. Nevertheless, finding preemption under § 14501(c) is not required, because § 14506(a) clearly preempts the placard provision.

### B.   Preemption under 49 U.S.C. § 14506(a)

The Port-mandated placard is a "form of identification" under 49 U.S.C. § 14506(a), because it identifies a truck as one serving the Port and provides a phone number to report unsafe activity. Section 14506(a) provides:

> No State [or] political subdivision of a State . . . may enact or enforce any law, rule, regulation, standard, or any other provision having the force and effect of law that requires a motor carrier . . . to display any form of identification on or in a commercial motor vehicle . . . other than forms of identification required by the Secretary of Transportation.

Because the placard provision requires drayage operators to display "any form of identification on or in a commercial motor vehicle," the provision is plainly preempted. Further, as explained above, this requirement cannot be saved from preemption as a "proprietary" action lacking the "force and effect of law," because the Port is acting as a regulator (rather than proprietor) of drayage services.

### V.   Miscellaneous

The district court correctly held that the maintenance provision would have only a tenuous effect on prices, routes, and

services. *See* Maj. Op. at 18224. The record indicates that the time and cost of such compliance is minimal. The plaintiffs had the burden to show more than a tenuous effect, and they did not. Therefore, even though the majority did not rely on this reasoning, I concur with the conclusion of the majority that the maintenance provision is not preempted. However, I do not agree with the majority that the safety exception would save the maintenance provision for the reasons set out previously.

I agree with the majority that the concession agreements fail the narrow scope prong of the market participant test. Further, I concur that the employee-driver and financial capability provisions are preempted by federal law.