**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

   v.

TAMER ADEL IBRAHIM,
    *Defendant-Appellant.*

No. 07-50153

D.C. No.
CR-00-00852-CAS-
01

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
March 3, 2008—Pasadena, California

Filed April 14, 2008

Before: J. Clifford Wallace, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Wallace

3897

**COUNSEL**

James W. Spertus, Los Angeles, California, and Ronald Richards, Beverly Hills, California, for the defendant-appellant.

Thomas P. O'Brien, United States Attorney, Christine C. Ewell, Assistant United States Attorney, and Steven R. Welk, Assistant United States Attorney, for the plaintiff-appellee.

**OPINION**

WALLACE, Circuit Judge:

Tamer Adel Ibrahim (Tamer) appeals from the district court's denial of his motion for return of property, which he

filed pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure. There were no criminal charges pending at the time he filed the motion, so the district court treated it as a civil complaint governed by the Federal Rules of Civil Procedure. The principal question before us is whether the court erred when it applied a preponderance of evidence standard to resolve the summary judgment motion, rather than determining whether there was a material fact in dispute and, if not, whether the government prevails as a matter of law. Second, we must decide Tamer's request that we apply the doctrine of judicial estoppel to the amount of currency seized from his apartment. The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We reverse.

## I.

In December 1999, a task force of state and federal law enforcement officers executed a search warrant on Tamer's apartment in Los Angeles, California. Tamer was suspected in a wide-ranging conspiracy to import and traffic MDMA, the drug commonly known as ecstasy. During the search of Tamer's apartment, officers seized a total of $488,970.00 in U.S. currency. They discovered $240,000.00 in a bag outside the apartment, $221,000.00 in a safe, $485.00 on top of a dresser, and $27,485.00 elsewhere throughout the apartment. Tamer was eventually convicted of conspiracy to import and distribute MDMA in violation of 21 U.S.C. § 963 and conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). At sentencing, the government and Tamer both concurred in a presentence report (PSR), which mistakenly listed the total amount of currency seized from his apartment as $981,485.00. The mistake apparently stemmed from a transcription error that listed $485,000.00 as the amount found on Tamer's dresser instead of $485.00. Tamer was ultimately sentenced to 188 months in prison, and ordered to pay a $4.5 million fine and $4.5 million in restitution.

Several other defendants were indicted for crimes relating to the same MDMA conspiracy, including Tamer's cousin, John Ibrahim (John). The confusion in this case stems from the government's failure to distinguish the two cousins. The government instituted forfeiture proceedings against Tamer's property in January 2000. They initially mailed notice of these proceedings to Tamer's Los Angeles apartment, but addressed the notice to John. When it was returned as undeliverable, the government contacted John's attorney of record. He indicated that John had a new attorney. When contacted, that attorney informed the government that John was being detained at the Metropolitan Detention Center (MDC) in Los Angeles. On May 5, 2000, the government sent notice directly to John at the MDC. It also published notice of the forfeiture in a newspaper of general circulation. Receiving no objection, the government summarily forfeited Tamer's property on June 12, 2000. The government forfeited an additional $859.73 on October 5, 2000 to account for interest income that was inadvertently left out of the original forfeiture. The notice procedures followed by the government for this amount were identical to those preceding the June 12 forfeiture.

Five years later, in January 2006, Tamer filed a motion for return of property, pursuant to Federal Rule of Criminal Procedure 41(g). He alleged that he never received notice of the government's forfeiture proceedings. The government responded, still under the mistaken impression that John and Tamer were the same person. When Tamer pointed out the government's mistake, it filed a supplemental memorandum arguing, among other things, that Tamer had received actual notice of the forfeiture.

In September 2006, the district court issued an order denying Tamer's motion, but ordering the parties to submit supplemental briefs on the issue of actual notice. The court held:

> It appears that the government asserts that a factual dispute exists as to whether movant had actual notice

> of the forfeiture proceeding, given the fact that the government did notify John Ibrahim and Ronald Richards and published notification in the newspaper. Thus, pursuant to *United States v. Ritchie*, the Court concludes that this motion should be converted to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The government filed a memorandum and evidence in support of actual notice of forfeiture. It argued that actual notice should be imputed to Tamer, even though notice was never sent to him directly. The government pointed to telephone recordings from the MDC which showed that Tamer and John spoke frequently in the months leading up to the forfeiture. The recordings also demonstrated that the two men had discussed how the forfeiture process worked generally. Notably, the government did not have any tapes showing that Tamer and John spoke *after* John received the May 5, 2000 notice at issue in this case. Nevertheless, the government concluded that "[b]ased on their frequent and extensive telephone conversations and given their close familial relationship, it is inherently unlikely" that John failed to inform Tamer of the notice he received on May 5, 2000. In the alternative, the government argued that Tamer received notice through his current attorney, Ronald Richards, who also served as John's attorney "during much of the pendency of the forfeiture action."

In response, Tamer pointed to his sworn testimony in which he stated that he had no recollection of ever discussing the forfeiture proceeding with his cousin. In addition, John testified that he did not remember discussing the issue, and in fact has not spoken with Tamer at all since March of 2000. This statement conflicts with Tamer's testimony, stating that the two continued to speak frequently through July 2000. Finally, Tamer argued that "[a]t no time was [he] represented by Ronald Richards in connection with the case in front of this Court prior to July 26, 2004."

On January 2, 2007, the district court issued an order denying Tamer's motion for return of property. The court acknowledged that it was required to treat Tamer's Rule 41(g) motion as a civil complaint, governed by the Federal Rules of Civil Procedure, but held:

> [T]he government has provided circumstantial evidence from which the trier of fact could reasonably conclude that movant had actual notice of the forfeiture proceedings. Contrary to movant's argument, the Court need not find as a matter of law that movant had actual notice. Rather, the Court must consider whether the government has shown, by a preponderance of the evidence, that movant had actual notice.

Applying this standard, the court found that Tamer's testimony was not credible, and held that "the government has shown by a preponderance of the evidence that John Ibrahim or his attorneys did, in fact, inform movant about the forfeiture proceedings . . . ."

## II.

Tamer filed his motion for return of property under Federal Rule of Criminal Procedure 41(g). Because there were no criminal proceedings pending at the time of filing, the district court properly treated the motion as a civil complaint governed by the Federal Rules of Civil Procedure. *See United States v. Ritchie,* 342 F.3d 903, 906-07 (9th Cir. 2003).

[1] We have only had one occasion to address the procedural framework applicable to a Rule 41(g) motion when no criminal case is pending. In *Ritchie*, we treated the government's opposition to a Rule 41(g) motion as the equivalent of a 12(b)(6) motion to dismiss. *Id*. at 907. Because the district court considered evidence outside the pleadings, however, we remanded so that the government's opposition could be prop-

erly converted to a Rule 56 motion for summary judgment, consistent with the Federal Rules of Civil Procedure. *Id.* at 907, 911.

In the present case, the district court applied *Ritchie* and held that "a factual dispute exists as to whether movant had actual notice of the forfeiture proceeding," therefore "this motion should be converted to a motion for summary judgment." Unlike the court in *Ritchie*—which converted the *government's* opposition into a motion for summary judgment—the district court in this case appears to have converted *Ibrahim's* underlying motion for return of property into a motion for summary judgement. This was an error. Under the Federal Rules of Civil Procedure, it was the equivalent of converting a plaintiff's complaint into a motion for summary judgment.

The district court compounded this error at the next stage of proceedings. Instead of applying a summary judgment standard, it moved directly to the merits of Ibrahim's claim. The court concluded that it was not required to "find as a matter of law that movant had actual notice" and went on to decide the motion under a preponderance of the evidence standard.

**[2]** This ad hoc approach may be appropriate in a regular Rule 41(g) proceeding with a criminal case pending. In that situation, the Rule provides little guidance as to what procedures the courts are required to follow, other than the broad statement that they "must receive evidence on any factual issue necessary to decide the motion." Fed. R. Crim. P. 41(g). Once the district court treated Tamer's Rule 41(g) motion as a *civil* complaint, however, it was required to apply the Federal Rules of Civil Procedure. *Ritchie*, 342 F.3d at 907. These rules apply to each stage of the proceedings, the same way they would in the civil context.

**[3]** Therefore, under *Ritchie*, a court should first convert a government's opposition into a motion for summary judgment

if it cannot decide the matter on the pleadings. Then, pursuant to the Federal Rules of Civil Procedure, the court should determine whether the government has demonstrated that there is no "genuine issue as to any material fact," and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Taylor v. United States*, 483 F.3d 385, 387-88 (5th Cir. 2007) (treating a denial of a non-criminal case Rule 41(g) motion as a summary judgment in favor of the government). Finally, if the government is unable to meet this summary judgment standard, the motion for return of property (now being treated as a civil complaint) should not be dismissed at the summary judgment stage, and the court should go forward with additional proceedings consistent with the Federal Rules of Civil Procedure. *See Taylor*, 483 F.3d at 389-90.

**[4]** The district court in this case erred because it improperly converted Ibrahim's motion for return of property into a motion for summary judgment, and then decided the issue in an ad hoc proceeding, under a preponderance of the evidence standard. Treating the government's opposition as a motion for summary judgment, and applying the appropriate standard, we conclude that a genuine issue of material fact exists as to whether Tamer received actual notice of the forfeiture. Tamer and John both testified that they did not discuss the specific notice at issue in this case. Although the government has provided substantial circumstantial evidence to the contrary—and this evidence may be sufficient to support a finding of notice under a preponderance standard—there is a genuine issue of material fact as to whether Tamer received notice. This is particularly true since the government is required to show not only that Tamer received notice, but also that the information he received was "sufficiently accurate and detailed" to allow him to protect his rights. *See Ritchie*, 342 F.3d at 911. We therefore reverse the district court's summary judgment, and remand for further proceedings consistent with the Federal Rules of Civil Procedure.

### III.

Tamer next argues that he is entitled to recover a total of $981,485.00 instead of $489,829.73 as the government contends. To support the higher number, Tamer points to a line in his PSR, which lists a total of $981,485.00 in U.S. currency as having been seized from his apartment, including $485,000.00 found "on top of a dresser."

The government responds with the sworn declaration of an Immigration and Customs Enforcement (ICE) officer present during the seizure, who testified that only $488,970.00 was recovered from the apartment. He clarified that 485 dollars, not 485 *thousand* dollars, were seized from the top of Tamer's dresser. This account is supported by a contemporaneous report prepared by the San Bernardino Sheriff's Department on December 29, 1999. That report specifies that a total of 24 individual twenty-dollar bills and one five-dollar bill were retrieved from the dresser. Moreover, a paralegal from U.S. Customs executed a sworn declaration stating that a total of $489,829.73 had been forfeited, which included the original $488,970.00 seized, plus $859.73 in interest. This statement is supported by the notices sent to John on January 20, 2000 and May 2, 2000, both of which listed $488,970.00 as the amount of U.S. currency to be forfeited.

Tamer's entire argument rests on a single number contained in the PSR. He offers no other evidence to support the higher amount, other than his unsworn assertion that he "knew how much money had been seized, and it was $981,485.00 just as the government had said." Nevertheless, Tamer argues that the government, having relied on the higher number at sentencing, is now barred by the doctrine of judicial estoppel from advancing any other amount.

**[5]** Judicial estoppel " 'is an equitable doctrine invoked by a court at its discretion.' " *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), *quoting Russell v. Rolfs*, 893 F.2d 1033,

1037 (9th Cir. 1990). In determining whether to apply the doctrine, we typically consider (1) whether a party's later position is "clearly inconsistent" with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to "derive an unfair advantage or impose an unfair detriment on the opposing party." *Id.* at 750-51. In addition, we have held that judicial estoppel "seeks to prevent the *deliberate* manipulation of the courts," and therefore should not apply "when a party's prior position was based on inadvertence or mistake." *Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997) (emphasis added).

**[6]** The district court found that the actual amount seized from Tamer's apartment was $488,970.00, including only $485.00 from his dresser. This finding is supported by a contemporaneous report from the Sheriff's Department, as well as the sworn declarations of an ICE officer present at the scene and a U.S. Customs official responsible for sending out the relevant forfeiture notices. All the evidence in the record thus points to the fact that the probation office merely misplaced a decimal point when it prepared the PSR. Tamer has offered no evidence to the contrary, and we hold that the government's mistake does not meet the criteria for applying judicial estoppel. *See Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir. 1998) ("If incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply").

Furthermore, even if we were to apply the three-inquiry analysis from *New Hampshire v. Maine*, it will not "impose an unfair detriment" on Tamer to limit any eventual recovery to the amount actually seized from his apartment. *See* 532 U.S. at 750-51. Any harm Tamer may have suffered as a result of the government's mistake would have occurred at the time of sentencing. In that regard, it is not clear that he suffered any prejudice, even in the sentencing context. Tamer's PSR, in a section entitled "Assessment of Financial Condi-

tion," states that he "earned at least $10 million during the months before his capture and arrest." In addition to this $10 million, the PSR also states that his ability to "pay the maximum fine and restitution is also supported by the cash that was seized in 1999. During the searches and seizures in December 1999 alone, over $2 million in cash was recovered in or around three apartments on Wilshire Boulevard, one of which was Ibrahim's." The erroneous $981,485.00 figure, therefore, represented only a portion of the $2 million in cash cited by the PSR—and that number was itself only offered to supplement Tamer's $10 million in unaccounted-for drug proceeds. It therefore seems unlikely that Tamer's sentence would have been materially affected if the relevant line from the PSR had been properly amended to state that "over $1.5 million in cash was recovered in or around three apartments . . . ."

In any event, this issue is not directly before us. Whatever prejudice Tamer may have suffered at the sentencing stage hardly justifies the "return" of nearly half-a-million dollars in funds that were never actually seized from his apartment. To the extent Tamer wishes to challenge his sentence directly due to the misplaced decimal point, the government has stated during oral argument that it would not oppose a coram nobis petition to the district court.

**REVERSED AND REMANDED.**