**Mickey Lee DILTS, Ray Rios, Donny Dushaj, Plaintiffs,**

v.

**PENSKE LOGISTICS LLC; Penske Truck Leasing Co LP; et al., Defendants.**

**Case No. 08–CV–318 JLS (BLM).**

United States District Court, S.D. California.

Oct. 19, 2011.

James Jason Hill, Michael D. Singer, Cohelan Khoury & Singer, San Diego, CA, for Plaintiffs.

Christopher C. McNatt, Jr., Pasadena, CA, Randy Scott Grossman, Jones Day, San Diego, CA, Adam C. Smedstad, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Chicago, IL, James H. Hanson, R. Jay Taylor, Jr., Robert L. Browning, Scopelitis Garvin Light Hanson & Feary, Indianapolis, IN, for Defendants.

### ORDER:

**(1) GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, (2) DENYING PLAINTIFF'S MOTION TO STRIKE, AND (3) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

(ECF Nos. 108, 93, 87)

JANIS L. SAMMARTINO, District Judge.

Presently before the Court are Defendant's[1] motion for partial summary judgment and Plaintiffs' motion to strike several Declarations submitted by Defendant in support of its motion for summary judgment, as well as Plaintiff's request for judicial notice. Having considered the parties' arguments and the law, the Court **GRANTS** Plaintiff's request for judicial notice, **DENIES** Plaintiffs' motion to strike and evidentiary objections **AS MOOT,** and **GRANTS** Defendant's motion for summary judgment.

### BACKGROUND

This case arises out of Penske's alleged failure to provide lunch and rest breaks, pay overtime compensation, reimburse business expenses, and pay wages due to its employees. (*See* Class Cert. Order 1, ECF. No. 72.)[2] On April 26, 2010, the Court certified this case as a class action (ECF No. 72.) The class consists of "349 hourly appliance delivery drivers and installers in California who were assigned to its state-wide Whirlpool account." (Class Cert. Order 4.)

Defendant Penske operates "warehouse, distribution and inventory management services throughout the State of California," and hires hourly employees to engage in the "inventory, delivery, and installation of a multitude of vendor products." (Pl.'s Mem. ISO Mot. for Class Cert. 7, ECF No. 55.) Although it has since lost its contract with Whirlpool, during the time period in question Penske provided both transportation and warehouse management services to Whirlpool in California. (Def.'s Mem. ISO MSJ 8, ECF No. 87.) Under its contract with Whirlpool, Penske employees received customer orders and based on those orders "caused appliances to be manufactured outside California and then delivered by third-party motor carriers" to one of Whirlpool's two Regional Distribution Centers (RDCs) within California. (*Id.*) Penske warehouse employees

---

1. Because Defendants Penske Logistics, LLC and Penske Truck Leasing Co. LP share a common factual and legal position, this order treats them as a single Defendant, "Penske."

2. Where different, citations to the parties' filings in this order will refer to the page numbers assigned in electronic docketing, not to the documents' internal page numbering.

inventoried the appliances at the RDC warehouses and then loaded the appliances onto trucks for delivery to Local Distribution Centers (LDCs) or for delivery and installation to customers in California. (*Id.*) These trucks were driven either by Penske drivers/installers or by third-party motor carriers. (*Id.*) The driver/installers are accompanied by installers, who generally did not hold a commercial motor vehicle license but assisted in the unloading and installing of appliances at their destinations. (Pl.'s Mem. ISO Mot. for Class Cert. 9.) The Penske employees did not travel over state lines in the course of carrying out their duties, but remained within California at all times.

Because Penske "expected" the Plaintiffs to take their meal breaks, they utilized "a systematic policy of automatically deducting 30–minutes of work time [to account for those] daily meal periods." (Pl.'s Mem. ISO Mot. for Class Cert. 9; Def.'s Opp'n to Mot. for Class Cert. 2) "The deduction was taken without inquiry into whether the employee was actually provided with a timely 30–minute uninterrupted and duty-free meal period or not." (Pl.'s Mem. ISO Mot. for Class Cert. 9.) Further, "Company policy ... did not permit the driver/installers to leave their truck unattended, nor were the teams allowed to turn off their Nextel during breaks." (Pl.'s Memo. ISO Mot. for Class Cert. 8.)

The California meal and rest break (M & RB) laws involved in this motion are codified in Labor Code §§ 226.6 and 512. Section 226.6 states that employers shall not require employees to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission (IWC). Cal. Labor Code § 226.6. The applicable IWC order dictates, in pertinent part, a 30 minute meal period for every work period of more than five hours, and second 30 minute meal period for every work period of more than ten hours. IWC Order 9–2001(11).[3] With regard to rest periods, the IWC order requires every employer to permit all employees to take rest periods at the rate of ten minutes per four hours worked, in the middle of the work period if possible. IWC Order 9–2001(12). Employers must provide one additional hour of pay for each day that the employer fails to provide the meal period or rest period. Cal. Labor Code § 226.6; IWC Order 9–2001(11–12).

Plaintiffs state five causes of action, alleging violations of several provisions of the California labor code as well as unfair business practices in violation of California Business and Professions Code Section 17200(UCL). All three lead Plaintiffs worked "out of Whirlpool's Ontario, California facility." (Def.'s Opp'n to Mot. for Class Cert. 4–6, ECF No. 36.) Both Lead Plaintiff Rios and Lead Plaintiff Dushaj were employed as "installers" or helpers while Lead Plaintiff Dilts worked as a "driver/installer." (Memo. ISO Mot. for Class Cert. 17.) Plaintiffs contend that Penske "used a uniform dispatch record that identified a delivery/installation schedule, but did not schedule meal periods for the proposed class." (*Id.* at 8.) Driver/installers were required to document their lunch period on "a pre-printed area on [the dispatch record] form." (*Id.*) Defendant "provided each driver/installer a Nextel device for communication with the dispatchers, supervisor and customers during the day" but "did not require the driver/installer teams to use the Nextel to notify the company of meal or rest periods." (*Id.*)

---

**3.** These same requirements are codified with respect to meal periods in Section 512. Cal. Labor Code § 512.

Penske filed its present motion for partial summary judgment on May 11, 2011. (ECF No. 87.) Penske claims it is entitled to summary judgment on all of Plaintiffs' meal and rest break claims, Counts II, III, and Count V to the extent that it alleges a UCL claim derivative of Counts II and III, arguing that these claims are preempted by federal law. (Defs.' Mem. ISO MSJ 7.) Plaintiffs filed an opposition to Penske's motion on June 20, 2011, along with a motion to strike the declarations attached to Penske's motion. (Pl.'s Opp'n, ECF Nos. 92 & 93.) Penske filed a reply to Plaintiffs' opposition on July 7, 2011 (Def.s' Reply, ECF No. 99) and an opposition to Plaintiffs' motion to strike on September 12, 2011. (Def.s' Opp'n, ECF No. 104.) Plaintiffs filed a request for judicial notice on October 10, 2011 (ECF No. 108), and Penske responded on October 11, 2011 (ECF No. 109). The Court heard oral argument on October 13, 2011.

At issue in the instant motion for summary judgment is not whether Penske violated California's M & RB laws, but instead whether these M & RB laws are preempted by the Federal Aviation Administration Authorization Act of 1994 (FAAA Act) as a matter of law.[4]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could af-

fect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

4. Penske also argues that the M & RB laws are impliedly preempted by the hours of service (HOS) regulations promulgated by the Federal Motor Carrier Safety Administration (FMCSA) of the U.S. Department of Transportation as applied to Penske's driving activities

only. (Def.'s Mem. ISO MSJ 19.) Plaintiffs barely address this argument in their opposition. However, because the Court finds statutory preemption exists based on the FAAA Act, the Court need not reach the merits of this argument.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## ANALYSIS

### 1. Plaintiff's Request for Judicial Notice

■ Plaintiffs move the Court to take judicial notice of a determination by the FMCSA, 73 Fed.Reg. 79204–01 (Dec. 24, 2008), in which the agency rejected a petition for preemption of the M & RB laws because it did not have the authority under its authorization statute. (*See* Pl.'s Supp. RJN, ECF No. 108.) The Court finds that the documents are properly judicially noticed. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) ("We may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." (internal quotation marks omitted)); *see also* Fed.R.Evid. 201. This agency determination is a matter of public record, and Penske does not dispute the authenticity of the document. (*See* Def.'s Opp'n to Pl.'s Supp. RJN, ECF No. 109.)

Accordingly, the Court **GRANTS** Defendant's request for judicial notice.[5]

### 2. Preemption Under the FAAA Act

Penske argues it is entitled to judgment as a matter of law as to Claims II, III, and V, because the California M & RB laws are expressly preempted by the FAAA Act. Plaintiffs respond that Penske's activities do not fall within the scope regulated by the FAAA Act. Next, they contend that even if the FAAA Act applies, it does not preempt California's M & RB laws because those laws do not regulate the same sphere as the FAAA Act, in that they impose no substantive standards on "price, route, or service" of motor carriers. Third, Plaintiffs reason that even if the laws fall within the same sphere as the FAAA Act, they come within the "safety exemption" of the Act. Finally, Plaintiffs state that the doctrines of judicial estoppel and judicial admission should operate to bar preemption in this case. The Court addresses each of these arguments in turn, and concludes that none of them is persuasive.

---

**5.** The petitioners before the FMCSA were represented by James H. Hanson, who also represented Penske at oral argument before this Court on October 13, 2011. The petitioners included the Defendants in this case, Penske Logistics, LLC, and Penske Truck Leasing Co., LP. In taking judicial notice, the Court points out the inconsistency between Penske's position before the administrative agency and the position taken in this action. Before the FMCSA, Penske argued that the agency had the power to order the California M & RB laws preempted. However, for the FMCSA to hear the petition, the state law or regulation must be "on commercial motor vehicle safety" under 49 U.S.C. § 31141. The agency found the M & RB laws are not regulations on commercial motor vehicle safety, and declined to exercise authority over the petition. In complete contradiction, Penske argues before this Court that the laws do *not* fall within the motor vehicle safety exception of the

FAAA Act's preemption provision, as discussed below. Nevertheless, the Court finds judicial estoppel is not appropriate here, because the inconsistent positions were not taken in the same or related proceedings, and Penske was not successful in convincing the FMCSA of its position, nor did it derive benefit or unfair advantage from taking the position. (*See United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir.2008) (explaining the factors courts may consider in applying the equitable doctrine of judicial estoppel)). Further, Plaintiffs have not argued Penske should be judicially estopped in this regard. However, although neither binding nor subject to the Court's deference under *Chevron* because it is an agency's determination of a different statute than the one at issue here, the administrative determination is related to the instant action, and the Court finds it is properly judicially noticed.

### A. Penske's Activities Fall within the Scope Regulated by the FAAA Act

■ Plaintiffs argue that the application of the FAAA Act to Penske's activities in this case is a disputed material fact for two reasons: (1) the employees operated solely within California, and thus performed intrastate activity not covered by the Act; and (2) driving and delivery was purely incidental to the manual installation of appliances within California, and thus the employees are not "motor carriers" under the definition of the Act. (Pl.'s Opp'n 10.) However, this is incorrectly posed as a factual dispute. Both parties agree on the duties Plaintiffs performed within the scope of their employment. These duties included loading Whirlpool appliances from warehouses in California onto their trucks, transporting the appliances to other locations within California, and installing the appliances. The dispute is not over these facts, but instead over whether or not these activities fall within the scope regulated by the FAAA Act as a matter of law. The Court concludes they do fall within the FAAA Act's scope.

The FAAA Act of 1994 regulates several different categories of transportation. Under Subtitle IV of Title 49, which regulates interstate transportation, Chapter 145 specifically addresses federal-state relations and federal authority over intrastate transportation. 49 U.S.C. § 14501. Subsection (c)(1) states as follows:

> Except as provided in paragraphs (2) and (3), a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property. 49 U.S.C. § 14501(c)(1).

The task before this Court, then, is to determine (1) whether or not intrastate activity is covered by the act, and (2) whether Penske qualifies as a "motor carrier . . . with respect to the transportation of property" in this case as a matter of law.

First, the FAAA Act states that it preempts state regulation in the arena of intrastate transportation. Penske properly points to the findings of Congress with regard to preemption of intrastate transportation of property by the FAAA Act: "Congress finds and declares that . . . the regulation of intrastate transportation of property by the States has imposed an unreasonable burden on interstate commerce . . . and certain aspects of the State regulatory process should be preempted." Pub.L. No. 103–305, § 601(a), 108 Stat. 1569, 1605 (1994). These findings, along with the text of the statute, make clear that Congress intended to preempt State regulation in the areas governed by the FAAA Act to avoid and unreasonable burden on interstate commerce. Thus, Plaintiffs are incorrect that Penske's purely intrastate operations in this case exempts them from the FAAA Act's regulatory scope.

Second, the undisputed facts establish Penske's activities as those of a "motor carrier" under the definition of the FAAA Act. The definitions section of the act provides a very broad definition of the term which cannot be read to exclude Penske's activities. "The term 'motor carrier' means a person providing commercial motor vehicle . . . transportation for compensation." 49 U.S.C. § 13102(14). Further, the term "transportation" includes "services related to that movement." 49 U.S.C. § 13102(23). Plaintiffs, as Penske drivers/installers, operated commercial motor vehicles which transported property and conducted services related to that

movement. That they performed other services in addition to the transportation of property, such as installing appliances, is not enough to exempt them from regulation under the FAAA Act.

For these reasons, the Court concludes that Penske's operations at issue in this case are within the scope of the FAAA Act's regulation.

### B. California's M & RB Laws Fall within the "Preemptive Scope" of the FAAA Act

■ Plaintiffs next argue that, even if the FAAA Act governs Penske's activities in this case, it does not preempt California's M & RB laws because those laws do not impose substantive standards "related to" the price, route or service of a motor carrier. (Pl.'s Opp'n 11.) However, the history of the FAAA Act and its preemption provision, as well as binding authority from case law, inform the Court otherwise.

■ Federal law may preempt state law under the supremacy clause either by express provision, by implication, or by a conflict between federal and state law. *N.Y. Conference of Blue Cross v. Travelers Ins.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (citations omitted). When addressing preemption claims, "the question whether a certain state action is preempted by federal law is one of congressional intent. The purpose of Congress is the ultimate touchstone." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). The Court will not assume lightly that Congress intended to supplant state law, but instead starts with the opposite presumption. *Id.* Indeed, "where federal law is said to bar state action in fields of traditional state regulation," it is assumed that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Blue*

*Cross,* 514 U.S. at 655, 115 S.Ct. 1671 (citations omitted).

California's M & RB laws regulate an area of law traditionally regulated by the states, falling within states' "broad authority under their police powers to regulate the employment relationship...." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Thus, the crux of the Court's task is to determine whether Congress exhibited a clear and manifest intent to preempt California's M & RB laws.

To determine Congressional intent, the Court first must consult the text of the FAAA Act, as well as its structure and purpose, mindful of the Supreme Court's admonition that preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

#### (1) Interpreting Congressional Intent

The preemption language of the FAAA Act contained in Section 14501 does not, on its face, explicitly encompass state regulation of meal and rest breaks. Thus, the Court must next consider the legislative history of Section 14501 to determine if it was Congress's "clear and manifest purpose" that the California M & RB laws be preempted.

Congress regarded the preemption clause of the FAAA Act as a solution to several problems facing interstate commerce. *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca,* 152 F.3d 1184, 1187 (9th Cir. 1998). First, Congress stated that deregulation was necessary to eliminate nonuniform state regulation of motor carriers which had caused "significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and tech-

nology, and curtail[ed] the expansion of markets." H.R. Conf. Rep. No. 103–677, at 86–88 (1994), 1994 U.S.C.C.A.N. 1715, 1759–1760. Second, by enacting a preemption provision identical to that of the Airline Deregulation Act of 1978(ADA) which deregulated air carriers, Congress sought to "even the playing field" between air carriers and motor carriers. *Id.* at 85.

This imbalance between air and motor carriers arose after the 9th Circuit concluded that Federal Express fit within the ADA's definition of "air carrier," and held that California's intrastate economic regulations of the carrier's shipping activities were preempted. *Federal Express Corp. v. California Pub. Utils. Comm'n,* 936 F.2d 1075 (9th Cir.1991). As a result, ground-based shippers were faced with more strict regulation than their air-based competitors. By preempting the states' authority to regulate motor carriers, Congress sought to balance the regulatory "inequity" produced by the ADA's preemption of the states' authority to regulate air carriers. *See* H.R. Conf. Rep. No. 103–677, at 87, 1994 U.S.C.C.A.N. 1715, 1759; *see also Mendonca,* 152 F.3d at 1187.

In *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court held that state consumer protection laws were preempted by the ADA. In subsequent cases, the Supreme Court made clear that the same standard should be used in interpreting the identical language of the FAAA Act's preemption provision. *See Rowe v. New Hampshire,* 552 U.S. 364, 370, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (quoting *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Dabit,* 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006).)) Congress deliberately copied the preemption provision of the ADA into the FAAA Act, fully aware of the Court's interpretation of that language as set forth in *Morales. See* H.R. Conf. Rep. No. 103–677, at 83.

Thus, the Court turns to *Morales* and *Rowe,* which outline four principles guiding the Court's interpretation of FAAA Act preemption, for guidance.

(1) [T]hat state enforcement actions having a connection with, or reference to carrier rates, routes, or services are preempted; (2) that such pre-emption may occur even if a state law's effect on rates, routes or services is only indirect; (3) that, in respect to pre-emption, it makes no difference whether a state law is consistent or inconsistent with federal regulation; and (4) that pre-emption occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives.

*Rowe,* 552 U.S. at 370–371, 128 S.Ct. 989; *Morales,* 504 U.S. at 384, 386–87, 390, 112 S.Ct. 2031 (internal citations omitted). Courts have found that Congress' "related to" language has a "broad scope," is "deliberately expansive," and "conspicuous for its breadth." *Morales,* 504 U.S. at 384, 112 S.Ct. 2031 (surveying other Supreme Court decisions in which the pre-emptive reach of the "related to" provision was discussed.) Federal law, however, might not preempt state laws that affect fares in "only a 'tenuous, remote, or peripheral . . . manner,' such as state laws forbidding gambling." *Rowe,* 552 U.S. at 371, 128 S.Ct. 989 (quoting *Morales,* 504 U.S. at 390, 112 S.Ct. 2031.)

Although the scope of the preemption clauses of both the ADA and the FAAA Act has been hotly debated, it has never been fully resolved. *See, e.g., Am. Truck-*

*ing Assoc., Inc. v. City of Los Angeles,* 660 F.3d 384 (9th Cir.2011). It is clear that the law at issue need not directly regulate motor carriers in order to be preempted; it is enough that the effect of the regulation would be that motor carriers would have to offer different services than what the market would otherwise dictate or "freeze into place services that carriers might prefer to discontinue in the future." *See Rowe,* 552 U.S. at 371–72, 128 S.Ct. 989 ("the effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate"). However, neither *Morales* nor *Rowe* indicate exactly where, or how, it would be appropriate to draw the line between a significant impact and a tenuous effect because neither of the state laws at issue in those cases presented a "borderline question." *Morales,* 504 U.S. at 390, 112 S.Ct. 2031; *Rowe,* 552 U.S. at 371, 375–76, 128 S.Ct. 989.

In a very recent decision, the Ninth Circuit examined a "borderline case" of federal preemption under the FAAA Act. *See Am. Trucking Assoc., Inc. v. City of Los Angeles,* 660 F.3d 384 (9th Cir.2011). *American Trucking* acknowledged that "[t]he waters are murkier ... when a State does not directly regulate (or even specifically reference) rates, routes, or services." *Id.* at 396. Recognizing that preemption by the FAAA Act may occur even when the effect on rates, routes, and services is only indirect, *American Trucking* sets out the proper inquiry in "borderline cases" where the effect on prices, routes, and services may be close to merely tenuous or remote: "the proper inquiry is whether the provision, directly or indirectly, 'binds the ... carrier to a particular price, route or service and thereby interferes with competitive market forces within the ... industry.'" *Id.* (citing *Air Transport Ass'n of Am. v. City & Cnty. of San Francisco,* 266 F.3d 1064, 1071 (9th

Cir.2001)). *Air Transport* considered whether a city ordinance relating to equal protection of domestic partners had an effect on the routes of airlines, finding that the ordinance was not preempted because it "cannot be said to compel or bind the Airlines to a particular route or service," even though it might require airlines to increase their rates or cease operating at San Francisco Airport. *Air Transport,* 266 F.3d at 1072–74. In spite of the ordinance, air carriers could still "make their own decisions about where to fly and how many resources to devote to each route and service." *Id.* at 1074.

Thus, *American Trucking* and *Air Transport* make clear that the Court's task here is to determine whether these laws, which do not directly target the motor carrier industry, "bind" Penske's prices, routes, or services and thereby "interfere with competitive market forces within the ... industry." Although it is a close question, the Court finds that they do.

*(2) California's M & RB Laws Are "Related to" Prices, Routes, or Services*

Penske argues these M & RB laws have a significant effect on the routes of a motor carrier. The fairly rigid meal and break requirements impact the types and lengths of routes that are feasible. "The five stops Plaintiffs insist Penske should have ensured at specified times in a 12–hour workday would thus have necessarily forced drivers to alter their routes daily while searching out an appropriate place to exit the highway, [and] locating stopping places that safely and lawfully accommodate their vehicles." (Def.'s Mem. ISO MSJ 31.) While the laws do not strictly bind Penske's drivers *to* one particular route, they have the same effect by depriving them of the ability to take any route that does not offer adequate locations for stop-

ping, or by forcing them to take shorter or fewer routes. In essence, the laws bind motor carriers to a smaller set of possible routes.

Additionally, the M & RB laws have a significant impact on Penske's services. The parties both agree that "scheduling off-duty meal periods for drivers 'would require one or two less deliveries per day' per driver." (Def.'s Mot. ISO MSJ 31 (quoting Pl.'s Reply ISO Mot. for Class Cert. 14 n. 9, ECF No. 65.)) Penske states further that the mandated duty-free 10–minute rest periods every four hours (preferably in the middle of the four-hour period) and duty-free 30–minute meal breaks every five hours reduce driver flexibility, interfere with customer service, and, "by virtue of simple mathematics," reduce the amount of on-duty work time allowable to drivers and thus reduce the amount and level of service Penske can offer its customers without increasing its workforce and investment in equipment. (*Id.*) Plaintiffs do not contest these facts.

In *Charas v. Trans World Airlines, Inc.,* the en banc 9th Circuit considered the meaning of "services" in the context of the ADA's preemption clause to refer

> to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided (as in, "This airline provides service from Tucson to New York twice a day.")
> . . .
> Congress used "service" in § 1305(a)(1) in the public utility sense—i.e., the provision of air transportation to and from various markets at various times.

160 F.3d 1259, 1265–66 (9th Cir.1998). In applying *Charas* to reject the ADA's preemption of state common law contract claims, the 9th Circuit recently explained that "a claim for breach of good faith and fair dealing does not relate to 'services' because it has nothing to do with sched-

ules, origins, destinations, cargo, or mail." *Ginsberg v. Northwest, Inc.,* 653 F.3d 1033, 1042 (9th Cir.2011).

Here, the length and timing of meal and rest breaks seems directly and significantly related to such things as the frequency and scheduling of transportation. Both parties agree that the M & RB laws impact the number of routes each driver/installer may go on each day, and Plaintiffs do not oppose Penske's argument that the laws impact the types of roads their drivers/installers may take and the amount of time it takes them to reach their destination from the warehouse. The connection to "schedules, origins, . . . and destinations" is far from tenuous. While Penske has not shown that the M & RB laws would prevent them from serving certain markets, the laws bind Penske to a schedule and frequency of routes that ensures many off-duty breaks at specific times throughout the workday in such a way that would "interfere with competitive market forces within the . . . industry."

Lastly, these ramifications of California's M & RB laws upon Penske's routes and services all contribute to create a significant impact upon prices. Penske produces facts regarding the cost of additional drivers, helpers, tractors, and trailers that would have been needed to ensure off-duty breaks under California's rules and maintain the same level of service. (Def.'s Mot. ISO at 33.) Plaintiffs do not dispute these facts, instead arguing that the M & RB laws, like some wage laws, do not have a close enough connection to impact prices or, in the alternative, that this evidence going to an "impact analysis" should be stricken, or, in the alternative, that the Court sustain objections to this evidence. (Pl.'s Opp'n 24, 25.)

As Penske admits, this is not an "increased cost of business" issue, and no factual analysis is required to decide this

question of preemption. (Def.'s Reply ISO MSJ 14.) It is more importantly the imposition of substantive standards upon a motor carrier's routes and services, as in *Morales* and *Rowe*, that implicates preemption here. Just as in *Rowe*, an emphasis on the additional imposition of costs upon carriers is "off the mark." *Rowe*, 552 U.S. at 373, 128 S.Ct. 989. The key instead is that to allow California to insist exactly when and for exactly how long carriers provide breaks for their employees would allow other States to do the same, and to do so differently. "And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations." *Id.* Thus, the Court finds state regulation of details significantly impacting the routes or services of the carrier's transportation itself preempted by the FAAA Act.

Because the Kitt and Russell Declarations are not necessary to resolve the instant motion, the Court **DENIES** Plaintiffs' motion to strike and evidentiary objections **AS MOOT.** To the extent that these evidentiary issues are pertinent to subsequent motions or at trial, the Court can rule on those relevant issues at that time.

### (3) Case Law Cited by Plaintiffs is Distinguishable or Not Persuasive

Plaintiffs point to cases in which various state laws were not preempted by federal law in opposition to application of federal preemption here. However, the Court is not persuaded by these cases.

Plaintiffs attempt to recast the M & RB laws as "simply the requirement to pay one hour of wages" (Pl.'s Opp'n 7) in order to analogize the instant case to several cases in which courts have found wage laws not preempted. However, this is a mischaracterization.[6] The M & RB laws require off-duty breaks for employees at certain times and of certain lengths. Thus, these are not simply wage laws which require employers to pay employees a certain wage and thus indirectly affect the prices of a service. These rules prescribe certain events (meal and rest breaks) that must occur over the course of the driver/installer's day, if Penske wishes to avoid paying a penalty. Although this penalty has been framed as a wage, the laws are distinct in formulation and impact.

Both *Dillingham* and *Mendonca* held that California wage statutes were not preempted by federal law. *California Div. of Labor Standards Enforcement v. Dillingham Const., Inc.*, 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) and *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir.1998), *cert. denied* at 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999). In *Dillingham*, the Court found that the connection was "too tenuous" between the California's prevailing wage laws and the employee benefit plans of the Employee Retirement Income Security Act of 1974 (ERISA). 519 U.S. at 319,

---

**6.** Plaintiffs repeatedly mischaracterize the M & RB laws as "wage laws" in arguing against preemption. In one such argument, Plaintiffs assert that preemption would create an "unnecessary conflict of law" with the Fair Labor Standards Act (FLSA) (Pl.'s Opp'n 21.) This argument presupposes the M & RB laws are "minimum wage laws." ("Under the FLSA, Congress *specifically allowed* states to enact more rigorous minimum legal protection for employee rights in wages and compensation." (*Id.*)) However, as discussed, the M & RB laws are not identical to minimum wage laws. Because Plaintiffs' argument is off base in painting the M & RB laws as "simply the requirement to pay one additional hour of wages," it is not persuasive, and the Court need not address other flaws in Plaintiffs's reasoning with regard to the FLSA.

117 S.Ct. 832. In so determining, the Court looked to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," as well as to the "nature of the effect of the state law on ERISA plans." *Id.* at 325, 117 S.Ct. 832. Not only are the objectives of ERISA distinct from those of the FAAA Act, but the California wage laws at issue in both *Dillingham* and *Mendonca* are not the same as the M & RB laws at issue here. As discussed above, the M & RB laws do not require the payment of a higher wage. Instead, they establish requirements which substantively impact a motor carrier's routes and services.

The connection between the instant case and two other cases cited by Plaintiffs, *New York State Conference of Blue Cross & Blue Shield Plans, et al. v. Travelers Insurance Company, et al.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) and *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) is even more tenuous. In *Travelers*, the Supreme Court held state statutes exacting surcharges for hospital care did not relate to employee benefit plans and were not preempted by ERISA. 514 U.S. at 662, 115 S.Ct. 1671. In *Wolens*, the Supreme Court held the ADA preempted state consumer fraud laws, but not breach of contract claims. To the extent that either holding is relevant here, both are entirely consistent with the Court finding preemption of the M & RB laws and UCL claims derivative thereof.

The other cases cited by Plaintiffs are neither binding nor persuasive. In *Fitz–Gerald v. Skywest Airlines, Inc.*, 155 Cal. App.4th 411, 65 Cal.Rptr.3d 913 (2007), the state appellate court held that the M & RB claims were preempted by the Railway Labor Act and then stated, in dicta, that the parties did not offer authority indicating that the ADA preempted the claims.

Further, *Fitz–Gerald* held that the ADA did preempt the UCL claims, which were presumably based upon the MR & B claims. This reasoning, while difficult to decipher, in any event does not support the proposition Plaintiffs offer it for. In *People v. Pac Anchor Transportation, Inc.*, 195 Cal.App.4th 765, 125 Cal.Rptr.3d 709 (2011), the state appellate court held that the FAAA Act does not preempt California wage laws, which, as discussed above, are distinct from the M & RB laws at issue here.

Plaintiffs also attempt to undercut the reasoning of a 2008 order from Judge Sabraw in the Southern District of California finding that the ADA preempted claims brought under California's M & RB laws. *See Blackwell v. SkyWest Airlines, Inc.*, 2008 WL 5103195 (S.D.Cal.2008). Plaintiffs argue that "it is clear that the safety exemption was not considered, nor does it appear that the court engaged in a rigorous analysis of whether Congress intended such a sweeping result.... While *Blackwell* acknowledges *Rowe*, it neither cites nor distinguishes the case from *Mendonca*." (Pl.'s Opp'n 17.)

However, the reasons cited by Plaintiff against *Blackwell* do not persuade the Court to find the opposite result here. Judge Sabraw's opinion in *Blackwell* focuses on the "robust and uncontroverted" evidence that high labor costs had led Skywest to discontinue services on routes to 16 stations across 11 states, that compliance would likely cause smaller communities to lose access to air transportation, that it would cost over $3,250,000 in additional annual labor costs if Skywest complied with California law, and that to retain profitability Skywest would have to pass labor costs onto the consumer. 2008 WL 5103195 at *18–19. While the Court does not agree that this type of factual analysis of the economic impact on Penske of higher labor costs imposed by compliance with

the M & RB laws is necessary or entirely persuasive, Plaintiff's arguments against the decision in *Blackwell* miss the mark. (*See* Pl.'s Opp'n 17.)

First, as the Court will discuss below, the safety exception does not apply to the M & RB laws. Second, Congressional intent to deregulate the motor carrier industry in order to eliminate a patchwork of state laws and to level the playing field between ground and air shipping is clear. Third, the instant case is distinguishable from *Mendonca*, which concerned the preemption of California wage statutes, and found there was only a tenuous connection to the routes, prices, and services of motor carriers. 152 F.3d at 1189.

At oral argument, Plaintiffs contended that by finding the M & RB laws preempted, the Court would embark down a slippery slope that would drag in nearly every state labor law as applied to motor carriers. To the contrary, the Court believes that few labor laws of general applicability would "relate to" the prices, routes, or services of a motor carrier under the standard set forth in *American Trucking* and applied here. It is important to distinguish the M & RB laws from wage laws for the very reason that this distinction helps mark the guardrail at the top of the slope. A wage law, which essentially increases the price of labor, impacts a motor carrier's prices, routes, or services in a tenuous way. *See Mendonca*, 152 F.3d at 1189. If the cost of labor goes up, then prices, routes, and services are more expensive. In the instant case, however, the impact is not derived from the increased cost of labor and is not tenuous. Rather, the impact is derived from the imposition of substantive restrictions upon the breaks taken by motor carrier drivers and drivers' helpers, which binds the motor carriers to a set of routes, services, schedules, origins, and destinations that it otherwise would not be bound to—thereby interfering with

the competitive market forces in the industry. It is this kind of interference Congress sought to avoid with the preemption clause that specifically prohibits state regulation related to prices, routes, and services.

The Court is confident that this decision does not force future courts down a slippery slope. The M & RB laws at issue here are significantly more connected to the routes and services of a motor carrier than laws that merely impact the cost of labor. The laws restrict Penske's routes and services in a way that is binding. As such, the Court finds these laws are "related to" the motor carrier's prices, routes, or services, and thus preempted by the FAAA Act.

### C. No Exception to the FAAA Act Applies

█ Plaintiffs argue that even if the M & RB laws fall within the same sphere as the FAAA Act and would otherwise be preempted by it, they come within the safety exception of the Act. However, the kinds of general public health concerns that are (or may be) involved in the California M & RB laws are not within the scope of the motor vehicle safety exception. *See Rowe*, 552 U.S. at 374, 128 S.Ct. 989.

Section 14501(c)(2)(A) lists several matters that are not covered by the preemptive scope of the FAAA Act. It states that the preemption clause does not:

> restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C § 14501(c)(2)(A). As the Supreme Court has explained, these exceptions contain no reference to public health, instead specifically pointing to motor vehicle safety. *Rowe*, 552 U.S. at 374, 128 S.Ct. 989. "Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it." *Am. Trucking Assoc. v. City of Los Angeles*, 559 F.3d 1046, 1054 (9th Cir.2009).

While Congress has not established a bright line rule for determining what qualifies as a motor vehicle safety regulation, some courts' rulings can give the Court guidance on this issue. *Id.* For example, regulation of tow truck services has been found to be within the safety exception because those regulations were "designed to make the towing and removal of vehicles safer." *Tocher v. City of Santa Ana*, 219 F.3d 1040 (9th Cir.2000), *abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 431–32, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). However, the Supreme Court has held that a Maine law which regulated cigarette delivery had a direct effect on prices and services and was not a regulation of safety. *Rowe*, 552 U.S. at 334, 128 S.Ct. 999.

■ The M & RB laws fall somewhere between these two examples. Plaintiffs correctly point out that these labor laws are general in nature but that they have a direct connection to worker health and safety. (Pl.'s Opp'n 22.) Plaintiffs cite a

California court's determination that "[e]mployees denied their rest and meal periods face greater risk of work-related accidents and increased stress, especially low-wage workers who often perform manual labor." *Murphy v. Kenneth Cole Prod., Inc.*, 40 Cal.4th 1094, 56 Cal.Rptr.3d 880, 155 P.3d 284 (2007). When applied to workers in the motor carrier industry, this could combine to create the impression that the laws regulate motor vehicle safety. The safety of employees working long hours without breaks is an issue of unquestionable importance to employees operating dangerous motor vehicles. However, although the public health concerns addressed by the M & RB laws are certainly serious, they are not directly connected to motor vehicle safety. If the Court were to hold them directly connected, then any law impacting the health and safety of an employee would fall within the motor vehicle safety exception simply because the employee is the driver of a potentially dangerous motor vehicle. Indeed, "[i]t is not enough to say that the provision might enhance efficiency, or reduce some kind of negative health effects. The narrow question ... is whether the provision is intended to be, and is, genuinely responsive to motor vehicle safety." *American Trucking*, 559 F.3d at 1054. Plaintiffs have not provided any evidence that the M & RB laws were intended to be responsive to motor vehicle safety, rather than to general public health concerns. Such a broadly sweeping exception as Plaintiffs suggest cannot be reconciled with the text and purpose of the FAAA Act, and with Congressional intent.[7]

---

7. Oddly, evidence proffered by Plaintiffs belies applying the safety exception here. As stated above, the Court granted Plaintiffs' request for judicial notice of the FMCSA's determination that it did not have authority to hear a petition for preemption of the California M & RB laws by the hours of service requirements promulgated by the FMCSA.

73 Fed.Reg. 79204–01 (Dec. 24, 2008). However, the Court is puzzled by this request. The agency's determination that it did not have the authority to hear the petition rested entirely upon its conclusion that the petition did not satisfy the threshold requirement under 49 U.S.C. § 31141(c) because the provisions are not "laws and regulations on com-

Accordingly, the Court finds the motor vehicle safety exception to the FAAA Act's preemptive scope does not apply here.

### D. Doctrine of Judicial Estoppel Does Not Operate to Bar Preemption

■ Finally, Plaintiffs assert that Penske is barred from arguing the M & RB laws are preempted because they violated the laws by garnering wages without providing the requisite breaks, and without paying the statutory penalty. (Pl.'s Opp'n 27–28.) Because they violated the laws, they never felt the impact as a result of compliance with the laws. This inconsistency, they argue, should end the Court's inquiry here because it is barred by judicial estoppel.

■ The Court finds judicial estoppel does not apply. "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.2001). In determining whether to invoke judicial estoppel, courts consider three factors: "(1) whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the

opposing party.'" *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir.2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

■ None of these three factors is met here. First, and most importantly, a party is certainly permitted to argue both that it has not broken a law and, in the alternative, that the law does not apply to it because the laws is preempted. These two positions are not inconsistent. Second, Penske has not persuaded the Court of its "earlier position" that it fully complied with all meal and rest period obligations, as the Court has not reached the merits of those claims in this case. Nor did the Court rely upon the evidence Penske provided regarding the impact on prices of compliance in ruling on this motion. Third, Penske derives no unfair advantage, and Plaintiffs sustain no unfair detriment, as a result of Penske being allowed to advance their preemption argument, as Penske has not been allowed to "change positions according to the exigencies of the moment," but has advanced two alternative arguments in its own defense.

### CONCLUSION

For the reasons stated, the Court finds the claims derived from California's meal and rest break laws preempted by federal law. Accordingly, the Court **GRANTS**

---

mercial motor vehicle safety," but rather laws applied generally to California employers. Plaintiffs clarified at oral argument that they offered the agency's determination in support of their argument that the M & RB laws are laws of general applicability that are not intended to be a subterfuge to impact routes and services of a motor carrier. While the Court does not find it should give the FMCSA's interpretation of the scope of its power under 49 U.S.C. § 31141 *Chevron* deference in the Court's analysis of the scope of a different statute (the FAAA Act), the Court notes the inconsistency inherent in Plaintiffs'

arguments. Whether the laws are "related to" prices, routes, or services is a different question from whether they are "laws on commercial motor vehicle safety." In addition, Plaintiffs appear to have overlooked the implications of the FMCSA's determination upon its own argument that the safety exception should apply to bar preemption by the FAAA Act. Thus, Plaintiff's use of the agency's determination misses the mark in terms of impacting the Court's preemption analysis, and it also directly contradicts Plaintiff's argument regarding the application of the safety exception.

Defendant's motion for partial summary judgment, and **DENIES** Plaintiffs' motions to strike and evidentiary objections.

**IT IS SO ORDERED.**